BISSELL *v.* FORD.

1. ADJOINING LANDOWNERS—EXCAVATION—LATERAL SUPPORT.
    In excavating near the boundary line of his premises, a proprietor must take reasonable precautions to prevent the falling of adjacent property, because of the removal of lateral support.[1]

2. SAME.
    He is liable for injury to the real estate even if he takes precautions such as are necessary and reasonable, but is not liable for damages caused to any superstructure.

3. SAME.
    If the pressure of the superstructure causes the land to fall, no liability arises from damages to either, but if he fails to take such reasonable precautions to protect his neighbor's realty and preserve it in a natural state, one who removes the lateral support is liable for injury to both land and buildings if the negligence was the proximate cause of the fall, and not the pressure or weight of the building.

4. SAME—EXCAVATION—LATERAL SUPPORT—NEGLIGENCE.
    It was a question of fact for the jury in a suit by the owner of a building for damage caused by excavating on adjoining premises, whether defendant's contractor exercised reasonable care in causing several caissons to be sunk from 65 to 114 feet, removing 45 per cent. of the soil in the belt included by the pits, which were across a 20-foot alley from the injured structure, and in leaving the openings exposed for several weeks; testimony of experts being offered to show that the method pursued was improper.

5. SAME—BUILDING AND CONSTRUCTION—NEGLIGENCE.
    Whether due care was used in ascertaining the character of the soil through which the excavation was required to extend, in order to protect an adjacent office building, was also a question of fact upon testimony showing that

[1] As to the liability for removal of lateral or subjacent support of land in its natural condition, see note in 68 L. R. A. 673. And upon the liability for injuries to buildings on adjoining land by negligent removal of lateral support of soil, see note in 6 L. R. A. (N. S.) 243.

a proper and careful exploration would have disclosed that
a body of salt water lay between the surface and bed rock,
rendering the sinking of caissons to the rock imprac-
ticable.

6. SAME—DUE CARE.

Defendants could not be required to have on hand equip-
ment sufficient to care for the large body of water which
they unexpectedly encountered at a depth of 90 to 115 feet,
as that would be to demand extraordinary precautions, but
the jury was rightly permitted to say whether a reason-
able effort was made to dispose of the water after it ap-
peared.

7. SAME—MASTER AND SERVANT.

For injury done by the negligence of a contractor work-
ing independently of the owner's control, he would not
be held responsible unless the work was inherently dan-
gerous.[1]

8. MASTER AND SERVANT.

Under a construction contract which provided that the
architect and his assistants should have free access to the
work, that the contractor should commence and cease from
operations when directed by the architect in case the
work was insufficiently or insecurely done, that the owner
might at any time make alterations in the plans, and the
architect might determine at all times how many men
should be employed continuously, and that in case of the
failure of the contractor to furnish materials and perform
labor according to the contract the owner might take the
work into his own charge, supervision and control of the
work upon the foundation was so reserved in the pro-
prietor as to charge him for injury caused to an adjoin-
ing building by negligent sinking of caissons and removal
of sufficient lateral support.

9. ADJOINING LANDOWNERS—REAL PROPERTY—EVIDENCE.

Evidence that the pressure of soil on the lagging or sup-
ports in certain pits caused the supports to bulge in the

---

[1] The authorities on the question of the liability of employer
for injury by independent contractor to lateral support are
treated in a note in 65 L. R. A. 849. And for general rule as to
absence of liability of master for acts of independent contractor,
see note in 65 L. R. A. 622. And on the question who is an inde-
pendent contractor, see notes in 65 L. R. A. 447 and 17 L. R. A.
(N. S.) 371.

direction in which the slipping or movement occurred was competent; also, testimony should not have been excluded that some space was necessarily left between the earth and lagging.

10. SAME—EVIDENCE.

While testimony of experts that, even with employment of a high degree of care, adjoining buildings are more or less affected, was properly received, the court erred in receiving evidence that in specific instances similar difficulties were encountered in constructing buildings specifically referred to.

11. SAME—DAMAGES—INJURY TO OFFICE BUILDING.

Damages might properly be based on the rentals or receipts from the building that stood on the premises affected by the defendant's negligent excavation, regardless of the worth of the real estate for other purposes.

12. DAMAGES.

When one has been injured in his property by the wrongful act of another, the claim for compensation cannot be successfully met by showing that if the injured property were devoted to other uses, the damage would be diminished.

Error to Wayne; Mandell, J. Submitted April 19, 1911. (Docket No. 50.) Decided June 2, 1913. Rehearing denied January 5, 1914.

Case by Blanche W. Bissell and others against Edward Ford and others for damages to an office building. Judgment for defendants. Plaintiffs bring error. Reversed.

*H. E. Spalding* and *Walker & Spalding (Harrison Geer,* of counsel), for appellants.

*Stevenson, Carpenter & Butzel (William L. Carpenter,* of counsel), for appellee Ford.

*C. K. Latham* and *William C. Stuart,* for appellee Goddard.

*Choate & Webster,* for appellee Vaughan.

BIRD, J. The plaintiffs are the owners of the Moffat building, which is six stories in height, situate on the southwest corner of Fort and Griswold streets, in the city of Detroit. Defendant Ford is the owner of the Ford building, which is located immediately south of the Moffat building; a 20-foot alley intervening. Each building has a frontage on Griswold street of 138 feet and upwards of 100 feet on the alley. The Ford building is an 18-story office building, and its construction was begun in August, 1906, with defendant Goddard as principal contractor. The building stands on 47 concrete piers, and the work of excavating for and construction of these piers was sublet by Goddard to defendants Vaughan and Dumont. The principal question in the case grows out of the manner in which the defendants Vaughan and Dumont did their work. Before beginning their work 11 borings were made at different locations on the premises, with a 2½-inch auger, to the depth of from 65 to 70 feet, and they disclosed a clay soil of varying degrees of consistency, with occasional streaks of sand. Vaughan and Dumont started the work on September 18, 1906, intending to put the caisson pits for the piers down to bed rock, a depth of approximately 120 feet, but at the depth of 95 feet they encountered a large body of sulphur water, which rendered it impracticable to go that far without increasing materially the cost of construction. It was therefore decided to go no farther than the 95-foot level and to fill the pits that were already below that level up to the 95-foot level. To compensate in part for not going to bed rock, the resisting power of the piers was increased by enlarging them at stated depths into bell-shaped formations. In pursuance of this plan, seven pits were sunk at the same time along, adjoining, and projecting into the alley. The five easterly ones were from 6 to 6½ feet in diameter and were sunk to a depth of between 114 and 115 feet.

The two westerly ones were 8 feet in diameter and were about 60 feet deep. Before these were completed, 8 pits along the Griswold street line were commenced. In excavating for the 7 pits along the alley, 45 per cent. of the soil within the belt in which they lay was removed. About a month was consumed in excavating the pits to the depths stated, and on October 20th water came into some of them, and on the next day it broke into one of the deeper ones in great volume and from there communicated to the others. The presence of the water in the pits caused all work to be suspended, and a considerable delay followed. The lack of adequate pumping machinery contributed to the delay. The work of pumping out the pits and filling them with concrete was begun on November 7th, and concluded on February 16, 1907. A few days before the water broke into the pits, it was observed that the alley side of the Moffat building commenced to settle, and it continued to settle until and after the pits were all filled; the maximum settlement of the wall next to the alley being $5\frac{7}{8}$ inches, and the lateral movement toward the alley being about 2 inches. The maximum settlement in the alley was $6\frac{1}{4}$ inches. This resulted in considerable damage to the Moffat building, causing its walls to crack and to materially lessen the life of the building. The cost of repairs was shown to be $23,000, and the permanent injury to the building was estimated at $75,000. It was for the recovery of these damages that this action on the case was commenced.

The right to recover is based upon the negligence of the defendants in the construction of the foundations. The several items thereof being stated as follows:

"(a) In failing to ascertain, before adopting the plan of construction, the character of the soil on the site of the Ford building and the presence therein of

a body of water such as would make the execution of that plan impracticable.

"*(b)* In sinking at the outset and at one time a line of pits in a part of their site where soil movement and seepage would be most likely to be caused.

"*(c)* In failing to adopt and use proper methods and adequate appliances in freeing the pits from water after they were flooded.

"*(d)* The neglect of a preliminary investigation to ascertain what lay between the surface and bed rock."

At the conclusion of plaintiffs' case, the trial court was of the opinion that no case had been made for the consideration of a jury, and accordingly directed a verdict for the defendants. The question as to whether the trial court was right in so doing is the principal question before us on review.

The question of the relative rights and obligations of adjacent landowners with reference to the lands in a natural state, and also with reference to making excavations and improvements thereon, was much discussed and considered in the case of *Gildersleeve* v. *Hammond*, 109 Mich. 431 (67 N. W. 519, 33 L. R. A. 46), and as a result thereof certain rules were therein laid down which were intended to serve as a guide and help in settling future controversies of that character. They are:

(1) While a landowner has the undoubted right to excavate close to the boundary line, he must take reasonable precautions to prevent his neighbor's soil from falling.

(2) If he has taken such reasonable precautions, and yet the soil falls from its own pressure, he is still liable for injury to the land, but not for any injury to the superstructure.

(3) If the pressure of the superstructure causes the land to fall, he is not liable either for injury to the land or superstructure.

(4) If he fails to take such reasonable precautions

to protect his neighbor's soil, and to preserve it in its natural state, he is liable for the injury to both the land and the superstructure, if the pressure of the superstructure did not cause the land to fall, and it fell in consequence of the failure to take such reasonable precautions.

The negligence complained of in the declaration brings the case within the last one of these rules. Viewing the situation through these rules, it is clear that the defendant Ford had a right to excavate to the depth which he did to secure his foundations, and, if in so doing due regard was had for the premises of his neighbors on the north, there can be no recovery in this case, even though there was a lateral movement of the soil, because no claim is made in the declaration for injury to the land. On the other hand, if the method adopted and followed was one which lacked skill and ordinary care, then he would be liable for the damages which ensued.

It is pointed out that the plan was lacking in skill and ordinary care in that seven caisson pits were sunk parallel with the alley at nearly one and the same time, to a depth varying from 65 to 114 feet, thereby removing 45 per cent. of the soil in the belt in which they were constructed next to and projecting into the alley, and that this exposure continued for several weeks. Engineers who were familiar with caisson foundation work testified that the method pursued was an improper one and that the proper way would have been to open the lines of caisson pits at right angles to instead of parallel with the Moffat building and to fill them with concrete as soon as they were sunk and to permit no more than one pit at a time to be open next to the alley. This ground of negligence was, under the testimony, a question of fact and should have been submitted to the jury.

Another ground of negligence is that, if it were

intended to go to bed rock, it should have been determined in advance what the character of the soil was which lay between the surface and the rock, and it is argued that subsequent events showed that, had this been done, the body of salt water which overlay the rock would have been discovered and the trouble which followed would have been in a measure obviated. This question was likewise the subject of expert testimony. That testimony suggested that in beginning the work one pit should have been put down to bed rock. This would have disclosed conditions between the surface and the rock and would have furnished a guide in sinking those that followed. In the construction of the modern skyscraper, which requires the foundations to be put down to such great depths, a due regard for the adjacent premises ought to make it incumbent upon those sinking them to use reasonable diligence to ascertain in advance the character of the soil through which it is intended to go.

The third item of neglect is the failure of defendants to adopt proper methods and adequate appliances to free the pits from water. To require defendants to have at hand equipment which would take care of as large a body of water as was encountered would be to hold that it was necessary for them to take extraordinary precautions; this they were not bound to do. Washburn's Easements & Servitudes (4th Ed.), [§ 439] p. 592. As to whether a reasonable effort in that direction was made after the presence of the water became known was one of fact, depending upon the great exposure of the lateral support and the ease with which adequate appliances could be supplied.

It is argued that, whatever injury resulted on account of seepage, no recovery can be had therefor, and that, as the testimony does not point out how much of the injury was due to the "too near digging" and how much to "seepage," the jury had no data upon

which a verdict could be based. The plaintiffs were entitled to the use and enjoyment of their land, protected by the lateral support of defendants' land. If that support was negligently removed and the adjacent premises were injured in consequence of it, of what importance is it that the lateral support was composed of one kind of soil rather than another? Whether the lateral support was composed of a rocky formation, a clay soil, a sandy soil, or a peat soil, or any admixture of these, and whether there was much or little moisture in it, the plaintiffs were entitled to its protective support, whatever it was. The kind of soil it was might be important in determining the amount of care required in removing it, because the care in removing must be commensurate with its cohesiveness and mobility. It must be borne in mind that the complaint made in this suit is that the lateral support was withdrawn in such a negligent manner that plaintiffs' land moved downward and outward and injury resulted. The plaintiffs do not deny the right to remove the soil to the depth it became necessary, but they complain of the manner in which it was done, and stake their case upon the proposition that all that was done might have been accomplished by the use of reasonable care, with no additional cost and without injury to them. If there were two ways in which defendant Ford could make the desired improvements on his land, one of which, with the use of reasonable care and skill, would not injure plaintiffs' premises, and another method which lacked skill and care, which would result in injury to them, it was clearly his duty to select the former. Whether he has done so was a question of fact. An examination of the testimony bearing upon this phase of the case has persuaded us that the questions whether there was a lateral soil movement, and, if so, whether it was occasioned by the failure of defendants to exercise reasonable care and

skill in putting down the foundations, and whether such soil movement would have taken place had not the building been situate thereon were all questions of fact for the consideration of the jury.

Much importance has been placed upon the cases of *Popplewell* v. *Hodgkinson*, 4 L. R. (Exch.) 248, *Frazier* v. *Brown*, 12 Ohio St. 294, and *New York, etc., Filtration Co.* v. *Jones*, 37 App. D. C. 511 (37 L. R. A. [N. S.] 193), as supporting the proposition that no recovery can be had for injuries resulting from seep-.age. In all of these cases complaint was made because of the doing of an act, viz., the withdrawing and diverting of subterranean waters to the injury of plaintiffs' premises. It was the doing of the act rather than the manner of doing it that caused the complaint. The right to do the act was denied. In the case at bar the right to do the act, namely, the putting down of the foundations to such great depth, is not denied, but the thing complained of is the negligent manner in which the act was done, and it is insisted by the plaintiffs that all that defendants accomplished might have been accomplished without injury to them, if the defendants had done the act with reasonable care and skill. Therein lies, in my opinion, the inapplicability of those cases to the facts disclosed by this record.

The further question is presented whether Goddard and Vaughan and Dumont, in doing the work, were independent contractors in the sense that defendant Ford would be relieved of liability for their negligence. This question must be determined from the contracts of the parties. The rule in such cases is well stated in *Atlanta, etc., Co.* v. *Kimberly*, 87 Ga. 161 (13 S. E. 277, 27 Am. St. Rep. 231), where it is said that:

"Where an individual or corporation contracts with another individual or corporation exercising an independent employment, for the latter to do a work not in itself unlawful or attended with danger to others,

such work to be done according to the contractor's own methods, and not subject to the employer's control or orders except as to the results to be obtained, the employer is not liable for the wrongful or negligent acts of the contractor or of the contractor's servants."

The opinion then proceeds to point out several exceptions to this rule, one of which is as follows:

"The employer may also make himself liable 'by retaining the right to direct and control the time and manner of executing the work, or by interfering with the contractor and assuming control of the work, or of some part of it, so that the relation of master and servant arises, or so that an injury ensues which is traceable to his interference.' "

The rule laid down in the foregoing is in accord with *Wright* v. *Manufacturing Co.*, 124 Mich. 91 (82 N. W. 829, 50 L. R. A. 495) ; *Larsen* v. *Telephone Co.*, 164 Mich. 295 (129 N. W. 894) ; *Ripley* v. *Priest*, 169 Mich. 383 (135 N. W. 258). Some of the stipulations of the contract which bear upon the extent to which the right was reserved by defendant Ford to direct and control the work are:

*(a)* The architect and his assistants shall at all times have free access to the work.

*(b)* The contractor shall enter upon the work when directed by the architect.

*(c)* The contractor shall cease work on any part of it which in his opinion will result in insecure or unsafe construction and shall not thereafter proceed with it until notified by the architect what to do and when to proceed.

*(d)* The owner may, at any time during the progress of the work, make alterations in plans, material, or workmanship, with proper allowance for extra expense, etc.

*(e)* The architect may direct how many men shall be continuously employed.

*(f)* In case of failure of contractor to furnish

materials, perform labor, etc., the owner is given the right to take the work into his own hands and complete it at the expense of the contractor.

*(g)* The contractor shall do all excavating for all basements, areas, caissons, etc., and shall remove from the premises all earth and debris, as directed by the architect.

*(h)* The contractor shall do all bailing and draining of caisson wells, trenches, and basement surfaces, which may be necessary during the progress of the work, using the best means of accomplishing the same, as directed by the architect.

*(i)* The contractor shall build caisson foundations as shown on both the engineering and architect's drawings, digging to be thoroughly braced and protected until concrete piers are complete; jacks and drums to be used where necessary. Shafts to be kept straight and plumb and carried down to bed rock. This, contractor shall estimate on a basis of depth.

*(j)* The contractor shall estimate on a basis of depth of 120 feet below grade line to bed rock and shall give a price per foot for additions to or deductions from this depth. As the excavations progress the sides of walls are to be cased with wood lagging, held in place by means of adjustable steel rings.

After specifying the method of construction and of filling the caissons, the contract then provides that:

"The entire work being executed in such a manner as to be acceptable to the architects in every respect."

It is apparent from these provisions that the defendant Ford reserved the right, through the architects, of a supervisory control of the building operations. It is not the case of making the architect the judge as to whether the work has been executed in accordance with the plans and specifications, but the right reserved goes further and reserves to him the right to partially control the work; to say how and when it

shall be done; to dictate the number of employees which shall be continuously employed; the right to take the work into his own hands in certain contingencies; and provides for an exercise of discretion by the architects as to the work during its progress. The right reserved is broad enough to permit the architects to dictate the manner and order of putting down the caissons.

Several errors are assigned because of the action of the trial court in the admission and rejection of testimony. As these questions will likely arise again on a retrial, they will be considered.

The witness Meier was asked on direct examination whether he ever saw in any of the caisson pits anything indicating that the soil was moving, and answered:

"That he did and that what he saw was on November 7, 1906, in the third pit south from the alley on Griswold street, and that what he saw was a strong bulging in the lagging on the northeast side of that caisson at an estimated depth of 60 feet below the street level; that the amount of bulging seemed to be about four inches (that is, that the lagging was swelled in or pressed in about four inches); and that a light was dropped either by the foreman or the clerk in order that he might see the bulge."

This testimony was, upon defendants' motion, stricken out because the caisson pit in which the observation was made was too far removed from the alley, and because there was no proof that the bulging was caused by the pressure of the earth.

Plaintiffs also offered to show, by expert testimony in connection with this question, that it was impracticable to put down caisson pits without leaving more or less space between the lagging and the earth. It was the contention of plaintiffs that the lateral movement of the Moffat building was caused by a movement of the soil under it to the south and toward the

caisson pits, and that the pressure of the soil against the lagging was evidence that the soil did move southward. It was a circumstance tending to support that contention, and the fact that such evidence was not conclusive of the question, and that there were other ways to show such movement did not necessarily render the proffered testimony incompetent. We think it should have been received. And we are also of the opinion that the testimony offered by the experts was admissible. If it were true that it is impracticable to put in lagging without leaving voids back of them, and on the occasion in question it was observed that the voids were filled and that there was a bulge in the lagging, it would be some evidence that an outside pressure was moving toward them.

The same witness upon cross-examination was asked:

"*Q.* Is it not a frequent occurrence where the best kind of care is used that adjoining buildings will be affected more or less? (Objected to as immaterial. Objection was overruled and an exception allowed the plaintiffs.)

"*A.* It does occur; yes, sir.

"*Q.* Didn't it occur in the case of the Hammond building with the same sort of soil that there was here under the Ford building? (Plaintiffs' counsel again objected, saying that every case must stand or fall on its own facts, and that we are not trying that case. That the Union Trust building was erected by driving piles, the Ford building upon caissons, and that the two methods were not comparable."

The first question does not appear to be objectionable, but the second one does. An inquiry of one who is skilled in such business as to the general effect the construction of a building of this character usually has upon neighboring buildings would not seem to be improper, whereas an inquiry which called for specific injuries to a particular building would lead so far into

the field of collateral questions that it would be objectionable.

On the cross-examination of Mr. Clark, manager of the Moffat building for plaintiffs, it appeared that the net rental of the Moffat building in the years 1907, 1908, and 1909 was between $16,000 and $17,000 a year. He was then asked whether the site could not be leased with the building off for at least $25,000 a year net. The trial court permitted the question to be answered over the objection of plaintiffs that it was immaterial and incompetent.

When one has been injured in his property by the wrongful act of another, the claim for compensation for such wrongful act cannot be successfully met by showing that, if the injured property were devoted to other uses, the damages would be thereby lessened. The use which is being made of the property at the time the injury occurs is a proper basis for estimating the damages. The objection should have been sustained.

The judgment of the trial court is reversed, and a new trial granted.

STEERE, C. J., and MOORE, McALVAY, KUHN, STONE, and OSTRANDER, JJ., concurred. BROOKE, J., did not sit.