STRONG v. NEIDERMEIER.

1. ADJOINING LANDOWNERS—EXCAVATION—BOUNDARIES — QUESTION FOR JURY.

In an action for damages to plaintiff's land claimed to have been caused by defendants' excavating to the south of the right of way for a drain granted by plaintiffs, testimony as to the true location of plaintiffs' boundary line, held, to present a question of fact for the jury.[1]

2. SAME—DAMAGES—QUESTION FOR JURY.

The question as to the time it would take and probable cost of repairing the damage done, upon which the testimony was conflicting, held, properly submitted to the jury.[2]

3. SAME—DAMAGES FOR FUTURE USE RECOVERABLE.

Where plaintiffs introduced testimony tending to support the claim in their declaration that an elevated ridge of land which was partly destroyed by defendants' excavation was thrown up for the double purpose of protecting their low land from overflow and for an elevated or graded

[1]Adjoining Landowners, 1 C. J. § 72; [2]Id., 1 C. J. § 72.

roadway, the trial court was in error in instructing the jury that plaintiffs could recover damages only for impairing its usefulness as a dike, the purpose which it then served, and that its value for a roadway could not be taken into consideration.[3]

4. SAME—PERMANENT INJURIES TO REALTY RECOVERABLE IN ONE ACTION.

If an injury to realty is permanent in character all the damages whether past, present, or prospective, may be recovered in a single action, and, moreover, recovery of such damages must be in a single action.[4]

Error to Monroe; Root (Jesse H.), J.   Submitted June 4, 1924.   (Docket No. 31.)   Decided April 3, 1925.

Case by Henry Strong and others against Henry G. Neidermeier and others for damage to plaintiffs' land. Judgment for plaintiffs for less than amount claimed. They bring error.   Reversed.

*Willis Baldwin,* for appellants.

*Oliver J. Golden,* for appellees.

STEERE, J.   In 1920, plaintiffs owned 168 acres of land lying adjacent to the north line of section 10 of town 6 south of range 10 east, Berlin township, Monroe county, Michigan.   In that year the Langton county drain was opened and excavated past the north side of plaintiffs' land.   The outlet was into Lake Erie a short distance east of section 10.   Shortly before reaching the outlet the drain ran for over half a mile east and west through the south side of section 3 parallel and adjacent to the section line between sections 3 and 10.   As it approached the lake the land was low and marshy, portions being under water much of the time, and that part of the drain was excavated with a dredge.   The dredging was done by defendant

[3]Adjoining Landowners, 1 C. J. § 71; [4]Id., 1 C. J. § 71; Actions, 1 C. J. § 303; Damages, 17 C. J. § 95.

Hickler, a subcontractor under the other defendants, who were farmers living in that locality and had bid in the contract let by the county drain commissioner for construction of that portion of the drain. No question is raised as to the validity of those proceedings, and only that portion of the drain along the north side of plaintiffs' land is involved here.

This action is to recover damages for injury claimed to have been done by defendants excavating "to the south of the right of way granted by plaintiffs," injuring an embankment which had been constructed by their predecessor in title near the north line of their land and a canal just south of it, to plaintiffs' damage, as stated in the *ad damnum* clause of their declaration, "in the sum of five thousand dollars ($5,000)." The case was tried by jury resulting in a verdict and judgment for plaintiffs of $200, from which they appeal, imputing the small amount of the verdict to erroneous rulings during taking of testimony and charge of the court.

Plaintiffs' predecessor, Governor Strong, bought and owned at his death the land in section 10 lying adjacent to its north line. He purchased the northeast quarter of section 10 in 1907. The original government survey of land in that locality was made in 1817. The field notes of that survey show the portion of the line involved here ran through "prairie;" that quarter section post was set "at average distance and raised mound." No one testified to finding the mound or original posts. There was testimony by old inhabitants and owners of the land adjacent to the north, of a stone and also iron stake marking what was claimed to be the northeast corners of section 10 and a stone at the quarterpost, and also of an old fence running from the northeast corner west on what adjacent owners to the north and south had recognized as the line between their holdings for many years, one witness testifying to remembering it as far back as

30 years; but the conflicting and somewhat confusing testimony of the parties is apparently at variance as to just where the true line was with reference to the Langton drain.     There was an old roadway which began at the claimed northwest corner of section 10 (and southwest corner of 3) running some distance east along the line and ending before it reached the quarterpost, which it was testified had been ditched on its sides, ridged up and used to some extent.

In 1911, Governor Strong had a surveyor run the section line for him on the north side of section 10. He located it nearly a rod north of where defendants claim was the true line.     Beginning near where the roadway ended Strong excavated a canal running east from there some 60 or 70 feet south of the line located for him, throwing the dirt to the north on his own land and forming a dike, which plaintiffs claim he intended and they expect to level down and make into a roadway leading from the east end of the old road back to the east end of their property near Lake Erie. For a better understanding of the testimony and situation to which it was directed the jury was sent to view the premises.

Plaintiffs' brief is devoted largely to a discussion of the testimony, from which it is contended that under undisputed facts the court should have held as a matter of law that the line as run in 1911 was the true north line of section 10.

The Langton drain was laid out to run westerly along that line to near the east end of the old roadway and then swing northerly into section 3.     Right of way had been secured for it from the respective owners, on each side of that line.     Much of the excavated material was dumped on the north side, though some of it was put on plaintiffs' side after permission had been obtained to do so.     It was shown the dredge which excavated the Langton drain along that line was 30 feet long and 29 feet wide, and cut the drain wider

and deeper than the contract called for, to which plaintiffs attribute in part at least the fact that defendants excavated outside of the right of way into their property. Defendants' witness Bathgate testified that 25 years ago he was chainman in a survey of the south line of section 3 and it agreed with the line of the old fence; that he was time-keeper on the dredge which cut the Langton drain and the first half mile of that drain "was dug on the north side of that fence." Wherever the line might have been, it was shown by plaintiffs' witness Case that the width of the strip of land between the Langton drain and plaintiffs' canal was 38 feet at the west end and would average 45 feet. After a careful examination of all the testimony touching that subject we are unable to conclude that the trial court erred in leaving the true location of the line in question to the jury.

It is admitted that in cutting the turn at the west of the quarterpost where the Langton drain swings north from the line into section 3 the dredge reached outside the right of way, gouging more or less into plaintiffs' property for a distance of 50 feet or more, and in attempting to repair the injury some earth piled on plaintiffs' dike slipped over into their canal. There was conflicting testimony as to the time it would take and probable cost of cleaning out and repairing this which was properly submitted to the jury.

Whether the dredge cut beyond the right of way and did injury to plaintiffs' dike in other places along the line was made an issue of fact by the conflicting testimony and also left to the jury, but the court instructed the jury that plaintiffs could only recover damages for impairing the usefulness of the dike and strip of land upon which it rested for the purpose it then served, as an artificial bank of earth or dam to prevent plaintiffs' low land being overflowed and its value for a roadway could not be taken into consideration.

Plaintiffs claimed in their declaration and introduced some testimony tending to show that elevated ridge of earth was thrown up for the double purpose of protecting their low land from overflow and for an elevated or graded up roadway by which to get over the low land to the back of their property and to Lake Erie just beyond. That line of testimony was objected to and what had been introduced stricken out on motion of defendants' counsel, followed by instruction to the jury as stated.

In support of that ruling counsel for defendants cites *Bissell* v. *Ford*, 176 Mich. 64, 78, quoting from its concluding paragraph that—

"The use which is being made of the property at the time the injury occurs is a proper basis for estimating the damages."

That language was used supplemental to a ruling that the claim for compensation there made could not be successfully met by showing that if the injured property was devoted to some other use than it was the damages would be diminished. Undoubtedly, under a certain state of facts, damages may be limited to the use being made of the property, if use is being made, but such is not the general rule. If it were there would be no redress, beyond nominal damages, for invasion of and injury done to vacant property lying idle and unused, whatever damage might be done to it. This action is brought to recover damages for an injury tortiously done to real estate. Damages mean compensation which the law authorizes for an injury inflicted. Plaintiffs' claims not only are injury to the dike itself but to the foundation on which it rested, of a permanent nature, by narrowing and removing its lateral support, the cost of restoring which would be prohibitive.

"If an injury to realty is permanent in character all the damages whether past, present, or prospective,

may be recovered in a single action, and, moreover, recovery of such damages must be in a single action." 8 R. C. L. p. 545.

"For a permanent injury to or trespass upon real estate, all damages, past, or prospective, are recoverable in one action."    17 C. J. p. 766.

"The market value of the tract may be shown for any purpose for which it could be most advantageously used and for which it would command the highest price."    4 Sutherland on Damages (4th Ed.), p. 3764.

If plaintiffs' contention is true this dike, or embankment, was a permanent improvement and integral part of their tract of land, valuable both as a guard against overflow and for a driveway over the low, swampy portion to its east end already constructed in part for that purpose and only necessary to level the top to make it available.    The trial court erred in eliminating all testimony directed to that subject, and in instructing the jury that the question of damages for injury to the embankment for roadway use was not for their consideration as only the use being made of the property at the time of the alleged injury was "the proper basis for estimating damages, and not a use for which the property may possibly be put to."

The judgment is therefore reversed, with costs to plaintiffs, and a re-trial granted.

MCDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.