BATOR *v.* FORD MOTOR CO.

1. MUNICIPAL CORPORATIONS—HIGHWAYS AND STREETS—ABUTTING OWNERS—WATER TUNNELS.

Use of public street with city's permission must be without interfering with the rights of the public and abutting property owners, mere absence of negligence being insufficient to relieve builder of 21-foot water tunnel 70 feet below street surface from liability for damages if it is impossible to carry on such construction without damage to abutting property.

2. EMINENT DOMAIN—TAKING PROPERTY FOR USE AND BENEFIT OF PRIVATE CORPORATION.

Private property cannot be taken by the public for the use and benefit of a private corporation without just compensation (Const. 1908, art. 13, § 1).

3. MUNICIPAL CORPORATIONS—HIGHWAYS AND STREETS—SUBSIDENCE
OF SOIL—NEGLIGENCE—SUPERSTRUCTURE—CONTRACTS.

Owners of two-story brick building on lot abutting street, 70 feet
beneath the surface of which a 21-foot water tunnel for use of
private corporation was constructed, pursuant to contract with
city whereby user agreed to take care of damage to private
property, without negligence but under circumstances whereby
construction without injury to abutting property was ad-
mittedly impossible, *held,* entitled to damages for subsidence
of soil not due to weight of superstructure.

4. SAME—DAMAGES—BRICK BUILDING—SUBSIDENCE OF SOIL.

Award of $4,600 to owner of two-story brick apartment and store
building for necessary repairs and $1,000 for diminished value
of the building due to settlement of soil because of construction
of water tunnel beneath city street surface for use of private
corporation *held,* reasonable.

5. CONTRACTS — HIGHWAYS AND STREETS — ACTION BY ABUTTING
OWNER—PUBLIC CONTRACTS.

Owners of building on lot abutting city street beneath which
water tunnel was built by contractor for use of private corpo-
ration pursuant to latter's contract with city to take care of
damage to such abutting properties *held,* entitled to maintain
action as member of public for such damages since contract is
a public one and for performance of duty for breach of which
city would otherwise be liable.

6. MUNICIPAL CORPORATIONS — TORTIOUS ULTRA VIRES ACTS —
OFFICERS.

Municipal corporation is not liable for tortious *ultra vires* acts
of its officers wholly outside of powers conferred on it by its
charter or by law, although officers themselves are liable.

7. SAME—TORT LIABILITY.

Municipal corporation is liable for tortious act which it has the
right to do under some circumstances or in some manner.

8. SAME—TORT LIABILITY.

Violation of statutory conditions or mistake in judgment in the
exercise of power to contract as to water supply for users with-
out municipal limits by proper municipal body does not pre-
vent tortious act committed during construction of extension
from being one for which city is liable.

9. SAME—APPEAL AND ERROR—QUESTIONS REVIEWABLE.

City's liability for tort committed in construction of extension of water system pursuant to contract, *ultra vires* in its conditions but not its subject matter, to the same extent as though the contract were valid, renders unnecessary determinations as to whether and in what respect it may be *ultra vires* and whether plaintiffs' title to property injured extends to the center of street beneath which water tunnel was built.

10. LIMITATION OF ACTIONS — INJURY TO REAL ESTATE — AMENDED DECLARATION.

Statute of limitations, if applicable, did not bar amended declaration filed in November, 1933, in action for damages for injury to two-story brick building through subsidence of soil because of water tunnel construction beneath street in front of plaintiffs' property commenced in September, 1930, and where subsidence of soil and damage to realty continued for approximately a year and a half (3 Comp. Laws 1929, § 13976).

11. APPEAL AND ERROR—DEFENSES NOT PROPERLY PLEADED—QUESTIONS REVIEWABLE.

In action for damages for injuries to real estate through subsidence of soil because of construction of water tunnel for use of private corporation beneath street in front of plaintiffs' property, defense of estoppel because of acquiescence in the work, which was not pleaded as required by Court Rule No. 23, § 3 (1933), is not considered on appeal.

12. MASTER AND SERVANT — DELEGATION OF DUTY TO INDEPENDENT CONTRACTOR.

Where one owes a duty to another, he cannot acquit himself of liability by delegating performance of the duty to an independent contractor.

13. HIGHWAYS AND STREETS — PUBLIC TITLE IN TRUST — COMPENSATION FOR VIOLATIONS OF TRUST INJURING ABUTTING OWNERS.

The qualified title which the public has in public highways is held in trust for public purposes only and violation thereof resulting in serious property damage to abutting owners entitles them to compensation therefor.

Appeal from Wayne; Miller (Guy A.), J. Submitted April 11, 1934. (Docket No. 86, Calendar No. 37,734.) Decided December 11, 1934.

Action by Kalman Bator and Matilda Bator against Ford Motor Company, a Delaware corporation, Stephen A. Healy and City of Detroit, a municipal corporation, for injury to a building caused by construction of a water tunnel beneath a street. John B. Trix and Herbert Trix intervened as plaintiffs. Verdict and judgment for plaintiffs. Defendants appeal. Affirmed.

*Jesse Demchak (Slyfield, Hartman, Mercer & Reitz* and *Royal A. Oppenheim,* of counsel), for plaintiffs.

*Colombo, Colombo & Colombo (George M. Clark,* of counsel), for defendant Ford Motor Company.

*Monaghan, Crowley, Reilley & Kellogg (Crawford S. Reilley,* of counsel), for defendant Healy.

*Raymond J. Kelly,* Corporation Counsel, and *James R. Walsh,* Assistant Corporation Counsel, for defendant City of Detroit.

BUSHNELL, J. Defendant Ford Motor Company, whose plant covers 1,100 acres located on the River Rouge in the city of Dearborn, desiring to double its power plant capacity, found it necessary to acquire a new source of condenser water supply of from 600,000,000 to 1,000,000,000 gallons of raw water per day, which is nearly double the amount of purified water used by the entire city of Detroit. The method then in use was to take raw water from the river, discharging it at a point below the plant, but there being very little fall between the two points, the heated water instead of going down the river to its confluence with the Detroit river, flowed backward to the intake, thus becoming overheated and contaminated. During the summer a maximum tem-

perature of 98 degrees was reached at the intake; water over 75 degrees temperature being practically unfit for condenser purposes.

Plans were prepared for acquiring a permanent and ample supply of water for cooling purposes by means of a tunnel running from the plant, a distance of 12,000 feet, to a proposed intake structure near Jefferson avenue, in the city of Detroit, on the old channel of the river; the department of water supply of the city of Detroit was asked to construct the tunnel and supply the water, it being estimated that the cost of the project would be about $2,500,000.

The charter of the city of Detroit, chapter 12, § 17, authorizes the extension of water pipes, aqueducts and mains without the city, but requires that the entire cost thereof shall be paid to the city and such pipes must become the property of the city. The water board is authorized to determine the rates at which the water shall be sold, such rates, however, not to be more than double the amount charged to inhabitants of the city. The section also includes language which might possibly be construed as having the effect of prohibiting the project, viz.:

"The amount of water sold to persons residing outside the city limits shall not exceed 25 per cent. of the amount furnished within the city."

Negotiations resulted in arrangements evidently designed to overcome the possibility of the charter restriction. The common council authorized the water board to advertise for proposals and then award the contract for constructing the tunnel to the Ford Motor Company for a nominal sum, upon its completion, the tunnel to become the property of the city and a part of its water system. It was to be leased to the company for a consideration of $1

and its maintenance, with the reservation that the city could terminate the lease on two years' notice. Following the preliminary agreement a formal contract was entered into between the city and the company and performance, labor and material bonds were executed, the contract sum being $1, all of which was then confirmed by resolution of the common council. The construction contract explicitly stated that any damage to private property should be taken care of to the satisfaction of the owners of said property.

The Ford Motor Company then entered into a contract with defendant Stephen A. Healy, a well-known tunnel contractor, who provided the work and materials for the agreed sum of $2,143,386, Healy by his agreement assuming all risk of damage or injury to person or property wherever located.

Four test pits and about 30 test borings had been made in order to determine the nature and characteristics of the soil; test hole number 7, opposite plaintiff's property, showing sand 19 feet, soft clay 5 feet, very soft clay from 24 to 44 feet, soft clay from 44 to 77 feet, sand, gravel and clay from 77 to 96 feet and stone and gravel from 96 to 98 feet, which resulted in the selection of the shield and upheaval method of construction.

After about 200 feet had been built, defendant Healy said: "there was quite a bit of settlement." The work was stopped and investigations made resulting in a change in the type of construction from a combination 10-inch wood cant and 25½-inch monolithic concrete lining to that of an 18-inch O'Rourke concrete tunnel block with 18-inch reinforced monolithic concrete lining; no change being made in any other provisions of the contract which provided that:

"The placement of the lining shall follow as closely behind the excavation as practicable. No more tunnel shall be excavated than will be lined within the 24 hours next succeeding, unless otherwise ordered or permitted."

The testimony shows that 118 days elapsed between the time the shield passed plaintiff's property and the installation of the lining, the record, however, being silent as to the responsibility for the delay. Construction of the tunnel was begun August 15, 1929, the shield passed plaintiff's property August 30, or September 1, 1930; the lining was installed December 27, 1930, and the whole project was completed in April of 1931.

Plaintiff's property fronting on the west side of Dearborn avenue on the northwest corner of Harbaugh avenue in the city of Detroit consists of a two-story solid brick building, with two stores below and apartments above. The building is within about one foot of the front lot line, one-half being erected in 1916 and the remainder in 1928. Plaintiffs Trix are mortgagees of the premises. Dearborn avenue at this point is 66 feet wide and is paved for a width of 40 feet. The tunnel is located in the center of the street, 70 feet below the surface; its outside diameter is 21 feet, it measuring 15 feet inside. The subsoil consists mainly of plastic clay through which the cutting edge of the shield working like a gigantic cookie cutter at a speed of about one inch a minute was forced by 20 hydraulic jacks capable of exerting a shoving pressure of between 3,000 and 4,000 pounds per square inch on the area of each jack. When the cuttings of clay amounting to 12½ cubic yards per lineal foot were being removed through four portholes in the bulkhead of the shield, the surface of the ground 70 feet above was raised several inches. After the shield had passed the soil subsided, im-

mediately automatically back filling around the monolithic slabs placed in the excavation. The downward pressure of the earth being about 5,000 pounds per square foot at the top of the tunnel and about 7,500 pounds at the invert.

The disturbance thus created in the surrounding soil resulted in changing the nature of the plastic clay so that it ceased to act as a solid and became more like a liquid. The ground in the vicinity of the tunnel subsided and continued to move and settle for approximately a year and a half afterwards.

About 23 days after the shield had passed plaintiff's property, show windows of the building started to crack, breaks appeared in the walls, and a sewer or water pipe was broken in the basement. Defendants' witness who later measured the settlement testified that the building settled $3\frac{1}{8}$ inches at the northwest corner, $2\frac{7}{8}$ inches at its front center, $\frac{7}{8}$ of an inch 20 feet from the southwest corner, $\frac{1}{4}$ inch 52 feet from the front line and 3/16 of an inch at the west rear corner.

The city's department of buildings and safety engineering served notices to "rebuild and place in safe condition all sections of walls where cracks appeared" and "provide adequate underpinning down to solid ground for the front wall of the building and place same in a safe condition." Plaintiffs were required to shore up the front portion of the building in order to prevent failure or collapse. Counsel for defendants and some of their expert witnesses conceded that such an excavation cannot be done without a disturbance and settlement of the adjoining soil.

Professor Housel of the engineering department of the University of Michigan, who was qualified as a soil expert by the defendants, claimed that the shield method was a proper one and in accordance

with good engineering practice, and that in his opinion there is no method known in engineering which has been successful in preventing subsidence under conditions similar to those encountered on the Ford tunnel. Defendant Healy said that out on Dearborn avenue a tunnel could not be constructed without damage to some of the buildings because of their character, type and age. Defendants' witness Spencer, an experienced foundation contractor, on direct examination stated that:

"The particles of clay, as they exist in nature, are not in contact with each other. They are held apart by water, and the forces of the water push the little particles of clay apart. There is also in this mass what is called a colloidal action, which makes the entire mass cemented by a jelly-like material, which makes clay appear to be the soft clay, appear to be like a jelly. As long as the material is left alone, that material acts as a solid. As soon as there is a pressure on it, the little particles of clay can move around in this bath of water, and the colloids redistribute themselves, and when the pressure is on this entire mass it acts like a fluid. That is what we mean by fluid. It is in a solid state and acts like a solid without pressure, but with any pressure on it it acts like a fluid."

He was asked:

"Assuming that these pressures were such that the raise in the ground was caused at all times before the shield, then there would be a disturbance in the clay all the way from the shield up to the surface?"

To which he answered:

"There would be a disturbance."

Plaintiff's declaration contained three counts: the first, based upon the provisions of the contract between the city and the company; the second, upon

alleged negligence in prosecuting the work; and the third, upon trespass or akin to trespass.

The case was tried before a jury, to whom were submitted seven special questions. The jury found that the proximate cause of the damage to plaintiff's building was the construction of the tunnel; that the work was carried on with a degree of care and skill which men ordinarily skilled in such operations would have exercised under the existing circumstances; that the reasonable cost of necessary repairs to the building was $4,600; that its value had been diminished by $1,000, but that no rent would be lost during the making of repairs.

The court filed an exhaustive opinion and after requiring plaintiffs to elect as to counts in their declaration, entered a judgment upon the third count of trespass on the case, against all defendants, jointly, in the sum of $5,600 and costs.

All parties have appealed. Plaintiffs allege error in the holding that plaintiffs did not own the fee of Dearborn avenue to the center thereof, and that the court committed error in requiring them to elect upon which count the judgment would be entered. Defendants say the trial court's errors consisted mainly in the refusal of a directed verdict in their favor; in not requiring plaintiffs to elect until after the special verdict of the jury, various errors in the court's charge to the jury and in its findings of fact and law, citing many excerpts from the written opinion.

It might be possible to enter into an interminable discussion of the ramifications of the issues presented, but stripped of all verbiage and technicalities, they may be reduced to this: Can plaintiffs under the pleadings and proofs recover for damage caused to an abutting building by the construction of a tunnel, 21 feet in diameter, 70 feet below the

surface of the center of a public highway, it being determined by a jury that there was no negligence on the part of the contractor or subcontractor, and it being conceded that it was impossible to carry on the construction without a disturbance and settlement of the adjoining soil thereby causing some damage to the abutting property?

Counsel with commendable zeal have directed our attention to almost 300 authorities to which an independent search has added others as well as discussions in leading law periodicals.

The Law Times, volume 169, p. 544, contains an excellent treatise on the development of the English law of lateral support in an article entitled: "Support of Land from Fluid Substances," and volume 1, No. 1, p. 28, of the Detroit Law Review of June, 1931, contains an article entitled: "The Right to Lateral and Subjacent Support of Land," suggested by the case of *Aristos* v. *Detroit & Canada Tunnel Co.,* 258 Mich. 579.

The English cases must be considered in the light of applicable statutes, but there, as here, we find a gradual modification of the harshness of the common law to meet the changing needs of society. This was pointed out by Lindley, Master of Rolls, in the case of *Jordeson* v. *Sutton, Southcoates & Drypool Gas Co.,* 68 L. J. Ch. 457 (80 L. T. R. 815), decided in 1899, in which the Court of Appeal said, where damage was caused by an excavation disturbing running silt located under plaintiff's property:

"*Popplewell* v. *Hodgkinson,* 38 L. J. Ex. 126 (20 L. T. R. 578; L. R. 4 Ex. 248), looks like and has generally been regarded as an authority that no action will lie in such a case."

But he added that he could not conclude his own judgment better than by reading what is found in

the American case of *Cabot* v. *Kingman,* 166 Mass. 403, 405 (44 N. E. 344, 33 L. R. A. 45):

"Whatever may be true of percolating waters, we think that the defendants had no right to take away the soil of the plaintiff in land which they had not taken under the statutes, and that it is immaterial that the soil was removed by means of pumps from the trench in which it had fallen by its own weight, or had been carried by percolating water. We are unable to distinguish the case from one where the soil falls in from the surface in consequence of an excavation in the adjoining land. The plaintiff, if the facts be as he offered to prove, has been deprived of the lateral support to his land, in consequence of which the quicksand has run from under the surface of his land into the trench, and has been removed by means of pumps, and this has caused the surface to settle and crack. It was the duty of the defendants to prevent this in some manner, if they did not take the plaintiff's land."

In the case from which we have just quoted, the facts show that the defendants "took all reasonable precaution" to keep the silt, as they cut through it and made their excavations, from falling in, and they kept their excavation as dry as they could by frequent pumping. Notwithstanding all their care, the land under the plaintiff's houses subsided, and their subsidence caused damage.

In the case of *Farnandis* v. *Railway Co.,* 41 Wash. 486 (84 Pac. 18, 5 L. R. A. [N. S.] 1086, 111 Am. St. Rep. 1027), the city of Seattle granted a franchise to defendants permitting them to construct a railway tunnel some 120 feet distant from plaintiff's property, which was damaged by either the shaking of the earth by blasts or by the tapping of an underground stream or subterranean flow of water. The

court said, after stating that the cause was a question for the jury:

"To hold under such circumstances that appellants would be liable only for the damage to the land, and not to the buildings, would be to follow the shadow of the old rule, and to disregard the substance of it and the reason upon which it was based.
\* \* \*

"The city could grant no greater right than it possessed; and since the city would be liable for damage caused by removing the lateral support, under the rule in *Parke* v. *Seattle,* 5 Wash. 1 (31 Pac. 310, 32 Pac. 82, 20 L. R. A. 68, 34 Am. St. Rep. 839), and *Brown* v. *Seattle,* 5 Wash. 35 (31 Pac. 313, 32 Pac. 214, 18 L. R. A. 161), therefore the corporation using the street for private gain by authority of the city would be liable in the same way." Citing *Cabot* v. *Kingman, supra.*

The court also quoted the following from *Smith* v. *Railway Co.,* 39 Wash. 355 (81 Pac. 840, 70 L. R. A. 1018, 109 Am. St. Rep. 889):

"If a railroad company cannot carry on its business upon its own property without necessarily disturbing the physical conditions of other property, it is evident that such company has not acquired sufficient property for the conduct of its business, and it should be required to pay such damages as the actual physical disturbance of the neighboring property entails thereupon."

See, also, *Prete* v. *Cray,* 49 R. I. 209 (141 Atl. 609, 59 A. L. R. 1241).

The action in the *Farnandis Case* was based upon article 1, § 16, of the Constitution of the State of Washington, which provides that no private property shall be taken or damaged for public or private use without just compensation having been first made or paid into court. Article 13, § 1, of the Con-

stitution of this State does not, however, use the word ''damage'' but reads:

''Private property shall not be taken by the public nor by any corporation for public use, without the necessity therefor being first determined and just compensation therefor being first made or secured in such manner as shall be prescribed by law.''

The liability of municipalities in this respect was discussed by Mr. Justice COOLEY in *Ashley* v. *City of Port Huron,* 35 Mich. 296, 301 (24 Am. Rep. 552), where he said:

''It is very manifest from this reference to authorities, that they recognize in municipal corporations no exemption from responsibility where the injury an individual has received is a direct injury accomplished by a corporate act which is in the nature of a trespass upon him. The right of an individual to the occupation and enjoyment of his premises is exclusive, and the public authorities have no more liberty to trespass upon it than has a private individual. If the corporation send people with picks and spades to cut a street through it without first acquiring the right of way, it is liable for a tort; but it is no more liable under such circumstances than it is when it pours upon his land a flood of water by a public sewer so constructed that the flooding must be the necessary result. The one is no more unjustifiable, and no more an actionable wrong, than the other. Each is a trespass, and in each instance the city exceeds its lawful jurisdiction. A municipal charter never gives and never could give authority to appropriate the freehold of a citizen without compensation, whether it be done through an actual taking of it for streets or buildings, or by flooding it so as to interfere with the owner's possession. His property right is appropriated in the one case as much as in the other.''

This was followed by Mr. Justice Champlin in *Defer* v. *City of Detroit,* 67 Mich. 346, where a demurrer was overruled to a declaration alleging damages arising out of the improper building of an outlet to the Franklin street sewer.

The rules laid down in *Gildersleeve* v. *Hammond,* 109 Mich. 431 (33 L. R. A. 46), were stated by Mr. Justice Bird in *Bissell* v. *Ford,* 176 Mich. 64, as being intended to serve as a guide and help in settling future controversies arising out of the relative rights and obligations of adjacent land owners with reference to land in a natural state, and also with reference to making excavations and improvements thereon. They are:

"1. While a land owner has the undoubted right to excavate close to the boundary line, he must take reasonable precautions to prevent his neighbor's soil from falling.

"2. If he has taken such reasonable precautions, and yet the soil falls from its own pressure, he is still liable for injury to the land, but not for any injury to the superstructure.

"3. If the pressure of the superstructure causes the land to fall, he is not liable either for injury to the land or superstructure.

"4. If he fails to take such reasonable precautions to protect his neighbor's soil, and to preserve it in its natural state, he is liable for the injury to both the land and the superstructure, if the pressure of the superstructure did not cause the land to fall, and it fell in consequence of the failure to take such reasonable precautions."

In the *Gildersleeve Case,* the plaintiff's judgment for damages caused by the undermining of her building was affirmed because defendants took no steps to prevent the soil from caving in or protecting plaintiff's building. There it was pointed out that the courts often find difficulty in determining

whether the superstructure did or did not cause the soil to cave in. In the case at bar, however, we have no trouble in determining from the evidence that the settling of the land was not affected in any way by the weight of the building, notwithstanding defendant's claim that it was due to improper footing and the absence of bonding.

In the *Bissell Case,* plaintiff's property was damaged by a settling caused by water seeping into caisson pits on defendant's property. That case turned on negligence, but Mr. Justice BIRD, speaking for the court, said:

"It is clear that the defendant Ford had a right to excavate to the depth which he did to secure his foundations, and, if in so doing due regard was had for the premises of his neighbors on the north, there can be no recovery in this case, even though there was a lateral movement of the soil, because no claim is made in the declaration for injury to the land. On the other hand, if the method adopted and followed was one which lacked skill and ordinary care, then he would be liable for the damages which ensued. * * *

"It is argued that, whatever injury resulted on account of seepage, no recovery can be had therefor, and that, as the testimony does not point out how much of the injury was due to the 'too near digging' and how much to 'seepage,' the jury had no data upon which a verdict could be based. * * * Whether the lateral support was composed of a rocky formation, a clay soil, a sandy soil, or a peat soil, or any admixture of these, and whether there was much or little moisture in it, the plaintiffs were entitled to its protective support, whatever it was. * * * An examination of the testimony * * * has persuaded us that the questions whether there was a lateral soil movement, and, if so, whether it was occasioned by the failure of defendants to exercise reasonable care and skill in putting down the foundations, and

whether such soil movement would have taken place had not the building been situate thereon were all questions of fact for the consideration of the jury.''

*Horowitz* v. *Blay,* 193 Mich. 493, was an action brought by a tenant for injuries to a stock of merchandise, caused by the falling of a wall of a building. The trial court found that plaintiff had failed to maintain a charge of negligence, but that if negligence had been shown, it was that of an independent contractor and, therefore, not imputable to defendants. A directed verdict against the plaintiff was sustained on appeal, there being no proof that the ground under the wall would have given away except for the weight of the building, and the obligation to support the wall was that of the plaintiff's landlord and not that of the excavators. The case turned on the absence of a showing of negligence.

*Collias* v. *Detroit & Northern Michigan Building & Loan Ass'n,* 220 Mich. 207, was an action for negligent injury to leased premises. A judgment for plaintiffs against the owner of adjoining property was affirmed on appeal. One of the independent contractors who did the excavating had a verdict directed in his favor. The rules of *Gildersleeve* v. *Hammond* and *Bissell* v. *Ford, supra,* were used by the trial judge in his charge to the jury. The evidence was that at a certain stage of the work the contractor, at the suggestion of the building inspector, assumed the duty of protecting the wall in accordance with the plan agreed upon by defendants. This, the court held, relieved the plaintiffs and the owner from any further responsibility.

During the construction of the Detroit and Windsor tunnel, property at the corner of Atwater and Randolph streets was damaged and plaintiff, a tenant operating a hotel, restaurant and lunch room,

brought an action against the Tunnel Company based upon 3 Comp. Laws 1929, §§ 13500–13503, and also upon the common-law liability, alleging the withdrawal of lateral support. The trial court held that no negligence had been proven but in trying the case without a jury, gave plaintiffs a judgment under the statute. Defendants alone appealed, so that the only question before the court was the construction of the statute. This being in derogation of the common law was strictly construed and held not applicable to excavations in the street and judgment was reversed, in *Aristos* v. *Detroit & Canada Tunnel Co., supra.*

We now return to the question we propounded:

"Can plaintiffs under the pleadings and proofs recover for damage caused to an abutting building by the construction of a tunnel 21 feet in diameter, 70 feet below the surface of the center of a public highway, it being determined by a jury that there was no negligence on the part of the contractor or subcontractor, and it being conceded that it was impossible to carry on the construction without a disturbance and settlement of the adjoining soil, thereby causing some damage to the abutting property?"

Mere absence of negligence is not sufficient if it is conceded that it is impossible to carry on the construction without damage to the abutting property. Where a city permits a private individual to use the public highway, it must be without interfering with the rights of the public and abutting property owners. *People, ex rel. Mather,* v. *Marshall Field & Co.,* 266 Ill. 609 (107 N. E. 864, L. R. A. 1915 F, 937, Ann. Cas. 1916 B, 743); *Boyden* v. *Walkley,* 113 Mich. 609. If private property cannot be taken by the public nor by a corporation for public use without the necessity therefor being first determined and

just compensation therefor being first made (article 13, § 1, Constitution of Michigan), surely private property cannot be taken by the public for the use and benefit of a private corporation without at least just compensation. Plaintiffs are entitled to be secured in their property rights by a decision of the courts.

It being conceded that it was impossible to carry on the construction without some damage to abutting property, we cannot see the justice in requiring plaintiffs, who are in no way interested, to bear any part of the cost. We think the jury could arrive at no other conclusion and that the amount of damages determined is fair and reasonable.

The trial court in its opinion cited *R. C. Mahon Co.* v. *R. S. Knapp Co.*, 262 Mich. 325, and the opinion written by Mr. Justice FEAD for affirmance, saying:

"The reasoning of the court in that decision, as quoted, clearly indicates that the justices who united in the opinion for affirmance would in connection with the present contract logically and justly unite in support of the opinion of Mr. Justice McDONALD, concurred in by Justices CLARK, NELSON SHARPE and WIEST, for reversal.

"It seems evident that under the reasoning of both opinions in that case the plaintiff in the present case has a right to rely upon the contract between the city of Detroit and the Ford Motor Company. As a matter of law, therefore, if damage has been done to plaintiff's building by the tunnel construction it was the duty of the Ford Motor Company to replace the same, the nonperformance of which duty gives rise to a cause of action in favor of the plaintiff in this case."

We agree with the trial judge, provided, however, that the ruling is limited to actions involving the

right of a member of the public to sue on a public contract, and in conformity to the law as given in 1 Restatement of the Law of Contracts, § 145, viz.:

"A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless,

"(a) An intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences, or

"(b) The promisor's contract is with a municipality to render services the nonperformance of which would subject the municipality to a duty to pay damages to those injured thereby."

We do not find it necessary, for a determination of the issues presented, to pass upon the right of others to sue upon contracts to which they are not privy.

The question of indemnification is not involved. In the drafting of the contract there seems to have been a realization of a duty on the part of the city towards "those along the line of the work," and the language exacted of the Ford Motor Company a promise to pay, running to the owners of property that might be damaged.

"Any damage to private property shall be taken care of to the satisfaction of the owners of said property."

Plaintiffs made their demand for satisfaction on January 26, 1931, it was denied, and the jury decided in their favor. The trial court and the jury

seemed to have had no difficulty in determining the matter and neither do we have any trouble in understanding the meaning of such clear and direct language. The contractual obligation should be discharged by sustaining the judgment entered upon the jury's verdict even though the plaintiffs were required to elect under protest as to counts.

It is claimed that the principal contract is *ultra vires* and the city contends that for *ultra vires* acts only the officers performing such acts and not the city itself are liable in tort. The claim is sound if the tortious acts are wholly outside the powers conferred on the municipality by its charter or by law. However, if the wrongful act is one which the municipality has the right to do under some circumstances or in some manner, then it is not *ultra vires* in the respect of relieving the city from liability for tort. 43 C. J. p. 933; 6 McQuillin Municipal Corporations (2d Ed.), § 2808, p. 810; note 42 L. R. A. (N. S.) 910; *Langley* v. *City Council of Augusta,* 118 Ga. 590, 596 (45 S. E. 486, 98 Am. St. Rep. 133).

It will be noted that chap. 12, § 17, of the city charter granted to the board of water commissioners general power to extend water service beyond the city limits. The subject matter of the contract at bar, therefore, was within the power of the city and the infirmity of the contract, if any, rests in the irregular exercise of the power and contemplated breach of charter provisions in connection with operation.

As the general power to extend the water system beyond the corporate limits existed in the city, it became a matter for the determination of the proper municipal bodies when and under what conditions that power should be exercised. The power was exercised not by inferior or administrative officers but

by an authorized board and also by the common council, the legislative body of the city. See *Sheldon* v. *Village of Kalamazoo,* 24 Mich. 383. Violations of statutory conditions or a mistake of judgment in the exercise of the power by such bodies does not prevent it from being the act of the city. No case in point has been found but the following authorities are illustrative or of interest: *Augustine* v. *Town of Brant,* 249 N. Y. 198 (163 N. E. 732); *Stoddard* v. *Village of Saratoga Springs,* 127 N. Y. 261 (27 N. E. 1030); *Thayer* v. *City of Boston,* 19 Pick. (Mass.) 511 (31 Am. Dec. 157); *Norton* v. *City of New Bedford,* 166 Mass. 48 (43 N. E. 1034); *Langley* v. *City Council of Augusta, supra;* 19 R. C. L. p. 1083.

Under the circumstances, the *ultra vires* character of the contract being in its specific conditions and not in the subject matter, the city is liable for tort to the same extent as though the contract were valid. Therefore, it is unnecessary to determine whether and in what respect the contract may be *ultra vires.*

*Ashley* v. *City of Port Huron* and *Defer* v. *City of Detroit, supra,* make it unnecessary to determine the question as to whether plaintiff's title runs to the center of the highway.

Defendants contend that the last amended declaration counted on a cause of action barred by the statute of limitations (3 Comp. Laws 1929, § 13976). The first declaration was filed in due season and was in trespass on the case, for consequential damages; the recovery had required no amendment. We find from defendants' testimony that the disturbed soil did not subside and come to rest for at least a year and a half from the time of upheaval so that the statute, if applicable, would not begin to run until at least February 1, 1932, assuming that damage con-

tinued during subsidence, as testified to by plaintiff's witness Mr. Hoffman. The amended declaration being filed November 21, 1933, was clearly within the statutory period. Nor do we understand that plaintiff abandoned the position already taken in the declaration which was amended.

As to the claim that plaintiffs acquiesced in the work and were therefore estopped to claim damages, we do not find this defense pleaded as required by Court Rule No. 23, § 3 (1933), and it will not be considered.

Was defendant Healy an independent contractor and is he alone liable?

Assuming for the purpose of argument, but not deciding that he was an independent contractor, *Wight* v. *H. G. Christman Co.*, 244 Mich. 208, is authority for the holding that where one owes a duty to another, he cannot acquit himself of liability by delegating performance of the duty to an independent contractor.

Since the hearing in this cause we have determined the question of taxation of the tunnel property and held the physical title to be in the city of Detroit. See, *Ford Motor Co.* v. *City of Detroit*, 267 Mich. 177.

We adopt substantially the closing language of the learned trial judge's opinion:

It is perhaps difficult to find authorities which bear directly upon the problems presented by this case. Possibly the difficulty in so doing arises out of the fact that in times past public authorities have refrained from permitting the use of highways for private purposes. The qualified title which the public has in public highways and streets is held in trust. That trust is that they shall be used for public purposes only. Ordinarily, the violation of that trust would be a matter for public cognizance only,

but where the public violates its sacred duty in that connection and that violation results in serious property damage to wholly innocent private parties, such violation in right and conscience and decency and fair dealing demands that the persons who are specially injured thereby shall be made whole. These plaintiffs, in common with a great number of other property owners along the line of Dearborn avenue, invested their property in substantial buildings. They did on their own property what they had a right to do. They have been injured in their property rights by acts primarily of the city of Detroit and the Ford Motor Company. They are wholly innocent parties and they had no chance to protect themselves from the property destruction which has overtaken them. For the courts to hold on any conceivable finespun legal theory that they are not entitled to fair compensation for the damage suffered would be to do them a grievous wrong which would be a blot upon the jurisprudence of the State of Michigan. The solid foundation upon which the civil liberties of the American people rest is the proposition that no man shall be deprived of his property, his liberty, or his life without due process of law. To hold that these plaintiffs are without remedy would be to hold that these defendants can sanction and do work in a public highway for the private benefit of one of them and in so doing have a right to ruin plaintiffs. The mere statement of such a proposition is unutterably shocking to one who believes that American liberties are founded on the principle of justice.

The judgment is affirmed, with costs to appellees.

NELSON SHARPE, C. J., and POTTER, NORTH, FEAD, WIEST, BUTZEL, and EDWARD M. SHARPE, JJ., concurred.