[S.F. No. 22739. In Bank. Oct. 19, 1970.]

MAX HOLTZ et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT et al.,
Real Parties in Interest.

COUNSEL

Hanson, Bridgett, Marcus & Jenkins and William J. Bush for Petitioners.

No appearance for Respondent.

Bledsoe, Smith, Cathcart, Johnson & Rogers, David J. Van Dam and Robert A. Seligson for Real Parties in Interest.

OPINION

TOBRINER, J.—Plaintiffs Max and Harry Holtz seek a writ of mandate to compel the Superior Court of the City and County of San Francisco to reinstate certain allegations stricken from their complaint upon motion of defendants San Francisco Bay Area Rapid Transit District (BART) and the City and County of San Francisco. Plaintiffs own improved real property fronting on Market Street in San Francisco, and in their first amended complaint in the underlying action they allege that, as a result of the extensive excavation of Market Street undertaken by defendant BART in connection with its construction of an underground rapid transit system, their land and buildings have been substantially damaged.

Specifically, plaintiffs claim that the excavation of the land adjacent to the northern boundary of their property, reaching a depth of 80 feet, caused the lateral support of their land to be withdrawn, with the consequence that portions of their land moved downward and laterally onto the defendant city's property, so that plaintiffs' buildings and other improvements settled and cracked. Plaintiffs sought recovery for the damage incurred on two distinct theories: (1) In count one of their complaint plaintiffs claimed that defendants were "strictly liable," i.e., liable without negligence, on a theory of inverse condemnation for the physical injuries proximately resulting from the construction of the public improvement as

deliberately planned and designed; (2) In the second count plaintiffs alternatively claimed that defendants had been negligent in the excavation activities and were thus liable for damages which were proximately caused by this negligence. Plaintiffs prayed for $30,000 damages to both the land and the improvements in each of the two counts of the complaint.

After the court overruled defendants' general demurrer to both causes of action, defendants moved to strike those allegations of the complaint alleging damage to the building and improvements. In support of this motion, defendants relied on section 832 of the Civil Code, which sets out the general mutual rights and duties of coterminous owners with respect to lateral and subjacent support.[1] ■ Defendants argued that section 832 rendered an excavating coterminous owner liable for damages to a neighbor's improvements only if the foundation of the neighbor's improvement equalled or exceeded the "standard depth," then defined as 12 feet;[2] since the complaint revealed that the depth of the foundations of

---

[1]Section 832 provides: "Each coterminous owner is entitled to the lateral and subjacent support which his land receives from the adjoining land, subject to the right of the owner of the adjoining land to make proper and usual excavations on the same for purposes of construction or improvement, under the following conditions:

1. Any owner of land or his lessee intending to make or to permit an excavation shall give reasonable notice to the owner or owners of adjoining lands and of buildings or other structures, stating the depth to which such excavation is intended to be made, and when the excavating will begin.

2. In making any excavation, ordinary care and skill shall be used, and reasonable precautions taken to sustain the adjoining land as such, without regard to any building or other structure which may be thereon, and there shall be no liability for damage done to any such building or other structure by reason of the excavation, except as otherwise provided or allowed by law.

3. If at any time it appears that the excavation is to be of a greater depth than are the walls or foundations of any adjoining building or other structure, and is to be so close as to endanger the building or other structure in any way, then the owner of the building or other structure must be allowed at least 30 days, if he so desires, in which to take measures to protect the same from any damage, or in which to extend the foundations thereof, and he must be given for the same purposes reasonable license to enter on the land on which the excavation is to be or is being made.

4. If the excavation is intended to be or is deeper than the standard depth of foundations, which depth is defined to be a depth of *nine* feet below the adjacent curb level, at the point where the joint property line intersects the curb and if on the land of the coterminous owner there is any building or other structure the wall or foundation of which goes to standard depth or deeper then the owner of the land on which the excavation is being made shall, if given the necessary license to enter on the adjoining land, protect the said adjoining land and any such building or other structure thereon without cost to the owner thereof, from any damage by reason of the excavation, and shall be liable to the owner of such property for any such damage, excepting only for minor settlement cracks in buildings or other structures."

Hereafter, unless otherwise stated, all section references are to the Civil Code.

[2]The statute has since been amended to define the "standard depth" of foundations as nine feet. (See Am. Stats. 1968, ch. 835, § 1.)

plaintiffs' buildings were only six feet, defendants claimed that they could not be liable for damages to the buildings or improvements and requested that such allegations be stricken. The trial court correctly concluded that section 832 does not absolve a *negligent* excavator from liability even if his neighbor's foundation does not reach "standard depth" and thus it denied the motion to strike with respect to the negligence count. The court granted the motion to strike with respect to the initial "strict liability" inverse condemnation count, however, apparently concluding that section 832 establishes the limits of liability for damages resulting from the withdrawal of lateral support when such damage is caused by public entities as well as when it is caused by private coterminous owners.[3]

■ (See fn. 4) Plaintiffs now seek a writ of mandate to compel the trial court to reinstate the stricken allegations,[4] contending that the trial court's order conflicts with prevailing inverse condemnation principles.[5]

---

[3]This rationale does not fully explain the trial court's action, however, because if the court acted pursuant to section 832 it should have properly granted defendant's general demurrer to the "strict liability" claim rather than only the more limited motion to strike. At common law a coterminous owner was strictly liable for damages resulting from the withdrawal of lateral support of land in its natural, unimproved state, but section 832 modified that rule by providing that "lateral support" liability for damage to both land and improvements would generally result only if the excavator were negligent. (Civ. Code, § 832, subd. 2; Comment (1931) 20 Cal.L.Rev. 62, 63.) The section created an exception to this general negligence standard in the situation in which a neighboring building's foundation reached the "standard depth"; under those circumstances, the excavator was strictly liable for any damage he caused if he, too, intended to reach standard depth (§ 832, subd. 4; Comment, *supra*, 20 Cal.L.Rev. 62, 67). Because plaintiffs' foundation did not reach "standard depth," it would appear that under section 832 a private coterminous owner would be liable for damage both to the *land* and to the improvement only if he were negligent. Thus, if the trial court believed section 832 was controlling, it should properly have dismissed the entire strict liability count instead of only those allegations dealing with the damage to buildings and improvements. In any event, since we conclude that the provisions of section 832 do not circumscribe the limits of a governmental agency's responsibility to compensate for damages directly inflicted by the withdrawal of lateral support, any error committed by the trial court in interpreting section 832 becomes immaterial.

[4]"Where it appears that the trial court has made a ruling which deprives a party of the opportunity to plead his cause of action or defense, relief by mandamus may be appropriate to prevent a needless and expensive trial and reversal." (*Tate* v. *Superior Court* (1963) 213 Cal.App.2d 238, 251 [28 Cal.Rptr. 548]; see *Souza & McCue Constr. Co.* v. *Superior Court* (1962) 57 Cal.2d 508 [20 Cal.Rptr. 634, 370 P.2d 338].) Most of the plaintiffs' injury involves the damages to their building and improvements and thus striking the allegations of those damages is, for all practical purposes, substantially equivalent to striking the entire inverse condemnation cause of action. Under these circumstances we believe plaintiffs may properly seek relief through a writ of mandate.

[5]Petitioner also contends that the 80-foot street excavation involved in the instant case is not a "proper and usual" excavation within the meaning of section 832, and thus that the section would not be applicable even if defendants were private property

 For the reasons discussed below, we conclude that defendant public entities may be liable on an inverse condemnation theory for the alleged physical damage to plaintiffs' property proximately caused by the excavation as deliberately planned and designed without a showing of negligence.

 Defendants' primary contention, as we understand it, is that since under section 832 a private excavating coterminous owner would not be liable, absent negligence, for the damage incurred by plaintiffs in this case, defendants, though public agencies, should likewise not be liable unless negligent. In thus equating the liability of public and private entities, defendants ignore, however, the distinct constitutional source of a public entity's responsibility to compensate for damages resulting from the construction of a public improvement and overlook the unique purpose of the inverse condemnation duty. Article I, section 14, of the California Constitution, provides that: "Private property shall not be taken or damaged for public use without just compensation. . . ." and it is this provision, rather than section 832, in which plaintiffs' inverse condemnation claim is fundamentally rooted. (See *Rose* v. *State of California* (1942) 19 Cal.2d 713, 724 [123 P.2d 505].) In such cases the purposes of the constitutional clause, rather than the limits established by a rule of statutory or common law allocating rights and responsibilities between private parties, must fix the extent of a public entity's responsibility.

In *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal. Rptr. 89, 398 P.2d 129], this court explicitly rejected the notion that there need be a congruence between public and private liability in inverse condemnation actions. Considerable physical damage to plaintiffs' homes had resulted in *Albers* from a landslide caused by the county's construction of a road; the landslide was completely unforeseeable, however, and the trial court explicitly found that the county had not been negligent in the construction of the road. The county, relying on a rather substantial body of cases,[6] argued that since a *private party* would not be liable for unforeseeable damages, the county, on these facts should likewise be free from a duty to compensate.

After undertaking an extensive review of all of our inverse condemnation cases, we concluded in *Albers* that the decisions declaring that "[i]f

owners. In view of our conclusion with respect to the public entities' liability under inverse condemnation, we have no occasion to examine the scope of section 832's operation between private coterminous owners.

[6]E.g., *Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19, 24 [119 P.2d 1]; *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 636 [220 P.2d 897]; *Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 283 [289 P.2d 1]; *Youngblood* v. *Los Angeles County Flood Control Dist.* (1961) 56 Cal.2d 603, 608 [15 Cal.Rptr. 904, 364 P.2d 840].

the property owner would have no cause of action were a private person to inflict the damage, he can have no claim of compensation from the state" (*Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19, 24 [119 P.2d 1]), had stated "the rule . . . much more broadly than required. . . ." (62 Cal.2d at p. 260); we reaffirmed the vitality of earlier precedent which stated that "the right assured to the owner by this provision of the constitution is not restricted to the case where he is entitled to recover as for a tort at common law. If he is consequently damaged by the work done, whether it is done carefully and with skill or not, he is still entitled to compensation under this provision." (62 Cal.2d at p. 257, quoting *Reardon* v. *City & County of San Francisco* (1885) 66 Cal. 492, 505 [6 P. 317].)[7]

■ On the facts of *Albers* itself we proceeded to affirm a judgment rendering the county liable for the actual physical damage proximately caused by its construction, and we generalized our holding by establishing that, with only two exceptions (to be discussed below) *"any actual physical injury to real property proximately caused by the improvement as deliberately designed and constructed is compensable under article I, section 14, of our Constitution whether foreseeable or not."* (62 Cal.2d at pp. 263-264.) (Italics added.)

As the *Albers* opinion carefully made clear, its general rule of compensability did not derive from statutory or common law tort doctrine, but instead rested on the construction, "as a matter of interpretation and policy" (62 Cal.2d at p. 262), of our constitutional provision. ■ The relevant "policy" basis of article I, section 14, was succinctly defined in *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 642 [220 P.2d 897]: "The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking." In other words, the underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is "to distribute throughout the community the loss inflicted upon the individual by the making of public improvements" (*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 350 [144 P.2d 818]): "to socialize the burden . . . —to afford relief to the landowner in cases in which it is unfair to ask him to bear a burden that should be assumed by society" (Mandelker, *Inverse Condemnation: The Constitutional Limits of Public Responsibility,* 1966 Wis.L.Rev. 3, 8).

In announcing our holding in *Albers* in the generalized form quoted

---

[7]The *Reardon* rule had been cited and followed on numerous occasions. (E.g., *Tyler* v. *Tehama County* (1895) 109 Cal. 618 [42 P. 240]; *Tormey* v. *Anderson-Cottonwood Irr. Dist.* (1921) 53 Cal.App. 559, 568 [200 P. 814] (memo. decision by Supreme Court modifying Court of Appeal opn.); *Power Farms Inc.* v. *Consolidated Irr. Dist.* (1941) 19 Cal.2d 123, 126 [119 P.2d 717].)

above, while of course most fundamentally influenced by this "loss distribution" premise,[8] we did not overlook the competing considerations which caution against an open-ended, "absolute liability" rule of inverse condemnation. Recognizing that "fears have been expressed that compensation, allowed too liberally, will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost" (*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 350 [144 P.2d 818]), we deemed it prudent to focus our policy inquiry.on situations which shared a general factual similarity with that present in *Albers*. Thus we limited our holding of inverse condemnation liability, absent fault, to "physical injuries of real property" that were "proximately caused" by the improvement as deliberately constructed and planned. ▇ We have no occasion in the instant case to analyze the operation of article I, section 14, beyond the limits suggested by the facts of *Albers;* here plaintiffs clearly allege that they have suffered "actual physical injuries of real property" and that such injuries "were proximately caused by the excavation and construction work . . . [as] deliberately designed and constructed by defendants. . . ."[9]

Thus, under *Alber's* interpretation of article I, section 14, the present plaintiffs clearly should be compensated for the damage to their land and improvements resulting from the BART excavation, notwithstanding the limits section 832 may place on a private party's liability, unless the instant case falls within either of two doctrinal categories which were expressly excepted from *Alber's* generalized strict liability rule. ▇ In attempting to reconcile earlier inverse condemnation cases in *Albers,* we identified two strains of decisions in which the urgency or particular importance of the governmental conduct involved was so overriding that considerations of public policy inveighed against a rule rendering the acting public

---

[8]We concluded our discussion by citing this passage from Sedgwick on Constitutional Law (quoted in *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 351 [144 P.2d 818]): " 'The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to show why the State should not pay for property which it destroys or impairs the value [of], as well as for what it physically takes. . . .' " (62 Cal.2d at p. 263.)

[9]Professor Arvo Van Alstyne has aptly pointed out that the "proximate causation" terminology utilized in *Albers* is potentially confusing, because the "proximate cause" doctrine of tort law is often defined in terms of "foreseeability," whereas the *Albers* decision, imposing liability absent foreseeability, could not have intended such a construction. (Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 435-438.) We recognize the greater precision, as Professor Van Alstyne contends (*id.* at p. 436) in restating this element of the *Albers* test in terms of "substantial" causation. (See also Mandelker, *Inverse Condemnation: The Constitutional Limits of Public Responsibility,* 1966 Wis.L.Rev. 3, 52.) In the instant case, however, defendants have raised no contention concerning an absence of the requisite degree of causation; we believe it proper to defer any change in language to a case which better reveals the competing considerations on the causation issue.

entity liable absent fault. The first exception, the *Gray* exception (*Gray v. Reclamation Dist. No. 1500* (1917) 174 Cal. 622 [163 P. 1024]), involved noncompensable damages "inflicted in the proper exercise of the police power"; the second exception, the *Archer* exception (*Archer v. City of Los Angeles* (1941) 19 Cal.2d 19, 24 [119 P.2d 1]), encompassed those cases in which the state at common law "had the *right* to inflict the damage." (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 262 [42 Cal.Rptr. 89, 398 P.2d 129].) (Italics in original.)

Defendants do not, and could not, properly contend that their excavation and construction activity in the instant case falls within the "police power" exception referred to in *Albers*. ■ As we explained fully in *Rose v. State of California* (1942) 19 Cal.2d 713, 730-731 [123 P.2d 505], the "police power" doctrine "[g]enerally . . . operates in the field of regulation," rendering "damages" occasioned by the adoption of administrative or legislative provisions noncompensable (e.g., *Hadacheck v. Sebastian* (1915) 239 U.S. 394 [60 L.Ed. 348, 36 S.Ct. 143] (reduction in property value resulting from zoning ordinance need not be compensated); *Chicago & Alton R.R. Co. v. Tranbarger* (1915) 238 U.S. 67 [59 L.Ed. 1204, 35 S.Ct. 678] (statute requiring railroads to construct drainage ditches along their tracks at their own expense does not constitute a compensable taking)); this doctrine of noncompensable loss comes into play in connection with more direct "taking" or "damaging" of property only under "emergency" conditions; i.e., when damage to private property is inflicted by government "under the pressure of public necessity and to avert impending peril." (*House v. Los Angeles Flood Control Dist.* (1944) 25 Cal.2d 384, 391 [153 P.2d 950].) Recognizing that a broad interpretation of this doctrine of noncompensable loss would completely vitiate the constitutional requirement of just compensation (*Rose v. State of California* (1942) 19 Cal.2d 713, 731 [123 P.2d 505]), the courts have narrowly circumscribed the types of emergency that will exempt the public entity from liability.[10] ■ From the present pleadings we find no indication that the "police power" exception could possibly be applicable in the instant case (Cf. *Youngblood v. Los Angeles Flood Control Dist.* (1961) 56 Cal.2d 603 [15 Cal.Rptr. 908, 364 P.2d 840]; *Bauer v. Ventura County* (1955) 45 Cal.2d 276 [289 P.2d 1]).

Defendants do contend, however, that the instant litigation falls within

[10]"Instances of this character are the demolition of all or parts of buildings to prevent the spread of conflagration, or the destruction of diseased animals, or rotten fruit, or infected trees where life or health is jeopardized." (*House v. Los Angeles County Flood Control Dist.* (1944) 25 Cal.2d 384, 391 [153 P.2d 950]. See generally Van Alstyne, *Statutory Modification of Inverse Condemnation: Deliberately Inflicted Injury or Destruction* (1968) 20 Stan.L.Rev. 617.)

the second exception referred to in *Albers,* the *"Archer* exception." In analyzing the *Archer* decision in *Albers* we found that "the [*Archer*] court held that a private riparian owner would have had a *right* to collect the surface waters on his land and channel them into the stream into which they would naturally drain even though this resulted in the flooding of lower lands. Based on this fundamental premise, the court was not required to go further than to hold that article I, section 14, did not require the state to pay for damages which it had a *right* at common law to cause." (62 Cal.2d at pp. 260-251.) (Italics in original.)

Defendants argue that since under the circumstances of the instant case, section 832 permits a private coterminous owner to excavate on his own property without incurring liability as long as he is not negligent, he has a "right" to inflict damages within the meaning of the *Archer* exception, and by analogy a governmental agency has a similiar "right" to inflict such damage. That interpretation of the "right" referred to in the *Archer* exception, however, would so expand the exception as to consume the general *Albers* rule. Under such an interpretation, whenever damage was caused by a nonnegligent act for which a private individual would not be liable, the private party could be designated as having a "right" to inflict such injury. If we held that the public entity possessed such a parallel "right," the doctrine that public responsibility is to be equated with private liability, which *Albers* explicitly disapproved, would be resurrected through the *Archer* exception. Indeed, our holding in *Albers* itself refutes the defendants' broad reading of the *"right* to inflict damage" concept. In *Albers* we assumed that a private party would not have been liable for the resulting unforseeable damages (in defendants' terminology, a private person had a "right" to inflict such damages) (see 62 Cal.2d at p. 262, fn. 3), but we still found the public agency responsible under the constitutional provision.

■ The fulfillment of the broad "cost spreading" purpose of the constitutional provision, as clarified in *Albers,* requires a limited application of the *Archer* exception rather than defendants' proposed expansive one. The doctrine of the common law "right to inflict damage," emanating from the complex and unique province of water law, has been employed in only a few restricted situations, generally for the purpose of permitting a landowner to take reasonable action to protect his own property from external hazards such as floodwaters. (E.g., *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 635-636 [220 P.2d 897]; *Lamb* v. *Reclamation Dist. No. 108* (1887) 73 Cal. 125, 129-131 [14 P. 625].) In some ways the language of the "right to inflict damage" projects a misleading concept, because the essential common characteristic of this category of cases is not

that they all involve the infliction of injury on others, but rather that they all involve injury resulting from the landowner's efforts to protect his own property from damage. In recognition of the generally perceived reasonableness of such action and, as a policy matter, to encourage protective measures to preserve land resources,[11] certain types of protective measures were cloaked in a legal "privilege."[12] (*Lamb.* v. *Reclamation District No. 108* (1887) 73 Cal. 125, 129-130 [14 P. 625]; *Gray* v. *Reclamation Dist. No. 1500* (1917) 174 Cal. 622, 651 [163 P. 1024]; *San Gabriel Valley Country Club* v. *County of Los Angeles* (1920) 182 Cal. 392 [188 P. 554, 9 A.L.R. 1200]; *Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19 [119 P.2d 1].) ▮ We need neither examine the continued validity of any of these long-lived doctrines, nor question the applicability of the policies supporting the "privileged" status of a particular private activity in the context of public improvements,[13] for we know of no case, and have

---

[11]See, e.g., *San Gabriel Valley Country Club* v. *County of Los Angeles* (1920) 182 Cal. 392, 401 [188 P. 554, 9 A.L.R. 1200] ("Not to permit an upper land owner to protect his land against the stream would be in many instances to destroy the possibility of making the land available for improvement or settlement and condemn it to sterility and vacancy. Such a rule would seriously interfere with the development of the country."); *Gray* v. *Reclamation Dist. No. 1500* (1917) 174 Cal. 622, 653 [163 P. 1024] (" '[T]here would be no right on the part of an individual to insist that primitive conditions be suffered to remain, and thus all progress and development to be rendered impossible.' ").

[12]According to Prosser, the "privilege" designation "signifies that the defendant has acted to further an interest of such social importance that it is entitled to protection, even at the expense of damage to the plaintiff. He is allowed freedom of action because his own interests, or those of the public, require it, and social policy will be best served by permitting it." (Prosser, Law of Torts (3d ed. 1964) p. 99.) This definition would appear to aptly explain the basis of the "right to inflict damage" cases.

It must be noted, however, that the "privilege" recognized by the *Archer* exception is not necessarily an "absolute privilege," but in many instances is only a "conditional" one. Thus, for example, even when a public agency is engaged in such "privileged activity" as the construction of barriers to protect against floodwaters, it must act reasonably and non-negligently. (See *Bauer* v. *Ventura County* (1955) 45 Cal.2d 276, 285-286 [289 P.2d 1]; *House* v. *Los Angeles Flood Control Dist.* (1944) 25 Cal.2d 384, 395-396 [153 P.2d 950]; *San Gabriel Valley Country Club* v. *County of Los Angeles* (1920) 182 Cal. 392, 399-400 [188 P. 554, 9 A.L.R. 1200]; *Granone* v. *County of Los Angeles* (1965) 231 Cal.App.2d 629, 647 [42 Cal.Rptr. 34].) The "conditionally privileged" nature of some conduct may also be reflected in the fact that the state will only be liable for a certain type of damage resulting from that conduct. (Cf., e.g., *Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 424 [62 Cal.Rptr. 401, 432 P.2d 3] (when state acts pursuant to its authority to regulate navigable waters, compensation is required only for "actual physical invasion of or encroachment upon fast lands.")

[13]Although many of our decisions in the past have often mechanically assumed that if a certain activity is privileged when performed by a private party it should be equally privileged when undertaken by a public entity (see, e.g., *Lamb* v. *Reclamation District No. 108* (1887) 73 Cal. 125, 129-130 [14 P.2d 625]), this facile conclusion often overlooks significant policy differences that exist between the private

been directed to none,[14] in which the activity involved in the instant action—the excavation of land to construct an improvement—has ever been conceived of as privileged activity.

On the contrary, courts in jurisdictions which have a "just compensation" clause comparable to California's have held that damages inflicted by street excavations upon property of abutting landowners are the kind of damages which most appropriately should be borne by the governmental entity, whether or not it engaged in negligent excavation. The discussions of two textwriters, which the *Alberts* opinion quoted at length (62 Cal.2d at pp. 259-260), make this point rather lucidly. Thus Nichols, in his treatise on Eminent Domain, concludes: "Common law liability is undoubtedly an indication of damage; but lack of liability at common law should not conclusively prove that there is no damage under the constitutional provision. Accordingly, courts are inclined to allow compensation for actual physical injury to land regardless of the fact that it was actionable at common law, *and in the case of injury to abutting property arising from a particular use of the street in front of it to disregard the test of common law liability altogether."* (Italics added.) (2 Nichols on Eminent Domain (3d ed. 1963) § 6.441[2], p. 494.) The discussion in American Jurisprudence reiterates this conclusion: "In cases of special and peculiar damage arising out of physical injury to property, courts are inclined to allow compensation although the injury is one that would not be actionable

and the public spheres. Although certain socially beneficial conduct may appropriately be designated "privileged" for private individuals in order that they will not be deterred from undertaking the activity, the public entity may continue to engage in this same "privileged" activity even if it must bear the loss of resulting damages. In such a case, there may well be no reason to depart from the general constitutional guarantee of just compensation. (See Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 499-508; Mandelker, *Inverse Condemnation: The Constitutional Limits of Public Responsibility,* 1966 Wis.L.Rev. 3, 7-8.)

[14]Defendants suggest that *Porter v. City of Los Angeles* (1920) 182 Cal. 515 [189 P. 105], while not designating "excavation" activities as "privileged" conduct, does imply that section 832 applies to governmental entities as well as to private persons. The precise issue before the court in *Porter* was whether plaintiff's claim against the city for damages resulting from an excavation was barred by the statute of limitations since it had been filed more than two years after the cause of action arose. In approaching this issue, the court appears to have assumed that the city's action would constitute a "trespass" (bringing into play the three-year "trespass" statute of limitations) only if the city had been negligent; thus the court never addressed the question whether the city could be liable absent negligence, since it apparently assumed that any such claim that might have accrued would have been barred by a shorter statute of limitations. Moreover, since the plaintiffs in *Porter* alleged that defendants had been negligent, the court rested its decision on that allegation.

In any case *Porter* was decided many years before our *Albers* decision, and consequently its holding must be read in the light of the subsequent decision's clarification of the conflicting scope of the inverse condemnation responsibility.

at common law if inflicted by an adjoining owner. *In cases arising out of injury to abutting property by alterations or erections in a street, the question whether a private owner might lawfully make similar alterations or erections on his own land without liability to his neighbors is never even considered.*" (Italics added.) (10 Am.Jur., Eminent Domain, § 138, pp. 764-765.)

A careful review of the case law of our sister states reveals the accuracy of the textwriters' general observations. (See *Cuneo* v. *City of Chicago* (1942) 379 Ill. 488 [41 N.E.2d 473] (damage resulting from non-negligent excavation of street compensable under constitutional compensation clause); *City of Covington* v. *Parsons* (1935) 258 Ky. 22 [79 S.W.2d 353] (same); *Bator* v. *Ford Motor Co.* (1934) 269 Mich. 648 [257 N.W. 906] (same); *Siemers* v. *St. Louis Elec. Terminal Ry. Co.* (1938) 343 Mo. 1201 [125 S.W.2d 865] (same); *In re Mill Creek Sewer* (1953) 374 Pa. 120 [97 A.2d 11, 12] (same); *Kunst* v. *City of Grafton* (1910) 67 W.Va. 20 [67 S.E. 74] (same); *Farnandis* v. *Great Northern Ry. Co.* (1906) 41 Wash. 486 [84 P. 18, 20] (same); cf. *In re Board of Rapid Transit R.R. Comrs. of City of New York* (1909) 197 N.Y. 81 [90 N.E. 456, 464] (same result reached under "just compensation" statute).)

Indeed *Reardon* v. *City & County of San Francisco* (1885) 66 Cal. 492 [6 P. 317], the seminal California decision construing the current "or damaged" wording of article I, section 14, as imposing liability for compensation absent fault, involved public activity and private damage closely analogous to that present in the instant case. In *Reardon,* the state, in the process of constructing a sewer and grading a street, piled heavy rocks, stones, and earth on the street; as a result of the increased pressure exerted by the weight of this heavy material, "the subjacent earth was squeezed and pressed downward and outwards, causing the displacement and the destruction of the foundation" of the plaintiffs' buildings located on the abutting property (66 Cal. at p. 495). The court held that plaintiffs could recover for the damages so sustained, notwithstanding the fact that they could not have prevailed against a private party under common law principles.

The damages allegedly incurred by the instant plaintiffs are of precisely the same nature as those at issue in *Reardon.*[15] Although the government action precipitating the damage in *Reardon* is factually distinguishable

---

[15]Realistically, the compensable injury sustained by plaintiffs is not the withdrawal of the right to lateral support, but the actual damage to their land and its improvements. (See *Kane* v. *City of Chicago* (1945) 392 Ill. 172 [64 N.E.2d 506, 508-509].) It would be irrational to distinguish damage resulting from soil movement on the basis of the direction (toward or away from a plaintiff's property) that the soil was moved.

from the excavation undertaken by the present defendants, defendants have suggested no persuasive basis for attributing any legal significance to this factual distinction.[16] We can perceive of no policy considerations that would justify differentiating, for purposes of our constitutional "just compensation" clause, damages inflicted in tunnel excavations from those caused by sewer construction.

Our decision in the instant case, and the *Albers* decision more generally, in effect recognize that, under article I, section 14, physical damages proximately resulting from a public improvement must be considered as direct a "cost" as the property actually condemned or the materials actually utilized in its construction. Indeed, in most instances a public entity may be able to forestall unintended physical damage by initially employing more protective measures in the actual construction of the project; in the instant case, for example, defendants could probably have prevented the damage to plaintiffs' property by expending additional funds in shoring up its excavation. This comment does not imply, however, that defendants would necessarily be negligent in not expending such funds; the likelihood of the damage may have been so remote and the expense of the additional protection so great that it was reasonable (hence, non-negligent) for defendants to forego supplemental measures initially. Nevertheless, since the undertaking of the excavation at this lower cost created some risk, however slight, of damage to plaintiffs' property, it is proper to re-

---

[16]Although defendants suggest that section 832 establishes a statutory policy as to excavation and this policy serves to distinguish *Reardon,* the substantive core of that policy does not essentially differ from the common law tort principles applicable to activities involved in *Reardon.* Under both section 832 and general tort principles, a private individual is liable for damages resulting from his negligence; indeed section 832 may impose a somewhat greater liability than the common law on the excavating property owner, since it renders him "strictly liable" whenever both his excavation and his neighbor's foundation reach "standard depth."

We note, additionally, that there is absolutely no indication from the language of section 832 of any legislative intention to single out public excavation operations for specialized treatment under the constitutional "just compensation" clause. (Cf., e.g., Agr. Code, §§ 5906, 6323. See generally Van Alstyne, *Statutory Modification of Inverse Condemnation: The Scope of Legislative Power* (1967) 19 Stan.L.Rev. 727, 776-784.) On the contrary, we may reasonably infer from the wording of the statute that the drafters probably did not contemplate the section's application to excavation in the public streets. The section defines the depth of a foundation as the depth "below the adjacent curb level, at the point where the joint property line intersects the curb. . . ." (§ 832, subd. 4.) This reference to a "point where the joint property line *intersects* the curb" seems to indicate that the section was conceived as principally governing excavations involving neighboring lots, rather than ones involving a lot and the street. In view of our conclusion that the public nature of the excavator renders inverse condemnation principles governing, however, we do not reach the question of the application of section 832 to a private excavation that does not involve adjoining lots.

quire the public entity to bear the loss when damage does occur.[17] "[I]n the generality of cases, the governmental entity with its superior resources is in a better position to evaluate the nature and extent of the risks of public improvement than are potentially affected property owners, and ordinarily [the governmental entity] is the more capable locus of responsibility for striking the best bargain between efficiency and cost (including inverse liability costs) in the planning of such improvements." (Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 495.)

In sum, we conclude that, in accordance with the general inverse condemnation principles set out in *Albers,* the instant plaintiffs will be entitled to compensation under article I, section 14, for "any physical injury to real property proximately caused by the improvement as deliberately designed and constructed." Thus the trial court erred in striking allegations of such physical injury from the initial count of their complaint.

The peremptory writ of mandate shall issue.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

[17]In *Lubin* v. *Iowa City* (1964) 257 Iowa 383, 391 [131 N.W.2d 765, 770] the city's 80-year-old water main, located six feet below the ground without a reasonable inspection capability, broke and flooded the plaintiffs' basement. The court stated: "A city . . . so operating knows that eventually a break will occur, water will escape and in all probability flow onto the premises of another with resulting damage. . . . The risk from such a method of operation should be borne by the water supplier who is in a position to spread the cost among the consumers who are in fact the true beneficiaries of this practice and of the resulting savings in inspection and maintenance costs." (See also *Smith* v. *City of Los Angeles* (1944) 66 Cal.App.2d 562, 578 [153 P.2d 69].)