[Nos. E005384, E005470. Fourth Dist., Div. Two. Sept. 22, 1989.]

KENNETH BUNCH et al., Plaintiffs and Appellants, v. COACHELLA VALLEY WATER DISTRICT, Defendant and Appellant.

**COUNSEL**

Oliver, Stoever, Barr & Einboden, Oliver, Stoever, Barr & Vose, Thomas W. Stoever and Heriberto F. Diaz for Plaintiffs and Appellants.

Redwine & Sherrill, E. Michael Kaiser, Gerald D. Shoaf, Chase, Rotchford, Drukker & Bogust and Thomas A. Wong, Jr., for Defendant and Appellant.

## OPINION

**CAMPBELL, P. J.**—This case involves a dispute between the owners of an apartment house located in the City of Rancho Mirage (plaintiffs/appellants Kenneth and Deidre Bunch—hereafter, the Bunches) and a local water district (defendant/appellant Coachella Valley Water District—hereafter, the District) concerning flood damage suffered by the Bunches' apartment house in 1979.[1] The flood damage was alleged to have been caused by a failure of one of the District's flood control facilities. The action sounded in inverse condemnation. The issue of liability was tried to the trial court, while the issue of damages was tried to a jury.

The trial court found in the Bunches' favor with respect to the issue of liability. Following the jury's subsequent determination of damages, judgment was entered. The Bunches have appealed from the judgment only with regard to the calculation of interest which was included as a part of the overall award of damages. The District has appealed from the judgment in all regards.[2]

As we discuss below, we conclude that this matter must be reversed and remanded to the trial court for further trial proceedings in light of our Supreme Court's recent decision in *Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550 [253 Cal.Rptr. 693, 764 P.2d 1070] (hereafter cited as *Belair*).

### FACTS

Inasmuch as this matter must be remanded to the trial court for further proceedings on a single, specific issue, the statement of facts need not be extensive.[3]

---

[1] During the pendency of this case in the trial court, the Bunches' property damage insurer, Safeco Insurance Co., joined in the matter as a plaintiff in intervention. However, Safeco is not a party to this appeal.

[2] These appeals were taken separately, under separate appellate case numbers. Pursuant to motion and stipulation of the parties, we ordered that both appeals be consolidated for all purposes.

[3] On appeal, the District has mounted a concerted attack on the admissibility and substantiality of the evidence relied on by the trial court in rendering its judgment. We do not reach those evidentiary issues on this appeal. Thus, our statement of facts is intended by us only as

Magnesia Springs Canyon, a natural watercourse which drains a watershed of approximately five and one-quarter square miles, is located in the mountains lying southerly of the City of Rancho Mirage. The discharge from the Magnesia Springs Canyon watershed drains in a northerly direction, passes over Magnesia Falls and forms the Magnesia Cove alluvial plain as it spreads toward Rancho Mirage.

In the late 1940's-early 1950's, flood control facilities were built on the Magnesia Cove alluvial plain to control the floodwaters which were periodically discharged from Magnesia Springs Canyon. These facilities consisted of earthen levees and dikes and were intended to direct the Magnesia Springs Canyon floodwaters in a northwesterly direction and into the West Magnesia Channel.

In 1966, the District became the owner of these flood control facilities.

In 1976, the flood control facilities here in question, the levee/dike system lying at the base of Magnesia Springs Canyon, were breached by storm waters which flowed northerly from the point of breach and flooded the Magnesia Cove alluvial plain. The facilities were thereafter rebuilt, possibly in a somewhat more substantial manner than that in which they had originally been built.

In 1979, the flood control facilities were once again breached by storm waters. This failure of the facilities occurred in the same location as had the 1976 failure—the point at which the facilities channeled the flow of waters from a more northerly direction to a more northwesterly direction. Once again, the Magnesia Cove alluvial plain was flooded. This time, the floodwaters reached and damaged the Bunches' apartment house.

In 1982, the Bunches filed the within inverse condemnation action. The matter came on for trial in 1987. Following the liability phase of the trial, a phase which saw the introduction of numerous pieces of demonstrative evidence and the extensive rendition of expert testimony, the trial court concluded, in pertinent part: "[District] flood control facilities were intended to divert flood waters from their natural direction of flow.

". . . . . . . . . . . . . . . . . . .

"[T]he CVWD [District] flood control facilities failed in exactly the same place as the 1976 failure [a point described by the trial court as being 'at or

a referential framework within which to discuss the issue of reasonableness and not as an indication that we have found certain facts to have been adequately established.

near the point where said facilities were intended to divert flood waters']. . . . Large volumes of flood waters were discharged through the point of failure in a concentrated manner and at an abnormally rapid rate of flow onto the Magnesia Cove alluvial fan.

". . . . . . . . . . . . . . . . ". . . . .

"The Court is convinced beyond any doubt that the damage to plaintiffs' real property was caused by a concentrated and rapidly flowing powerful body of water discharged from the point of failure of the CVWD flood control facilities. It was not local runoff that caused the damage to the subject property.

"The physical evidence is overwhelming that water from the break in the CVWD flood control facilities was the cause of the damage to plaintiffs' real property, much less a substantial cause of that damage.

"Accordingly, the Court renders judgment in favor of plaintiffs and against defendant CVWD on the issue of liability."

Of interest to us at this stage of the proceedings, the trial court conducted no inquiry into (and reached no conclusion as to) the reasonableness *vel non* of the District's actions in designing, constructing, operating, or maintaining the Magnesia Cove flood control facilities.

In December 1988, after this matter had come before us on appeal, our Supreme Court rendered its opinion in the *Belair* case and revitalized the issue of reasonableness in the context of determining whether the flood control actions of a public agency give rise to liability under a theory of inverse condemnation.

The threshold issues presented to us by this appeal, then, are whether the *Belair* analysis and rationale are applicable to this case and, if so, whether such applicability requires a remand of the matter to the trial court for further proceedings. We conclude in both instances that the answer is "yes."

DISCUSSION

I

THE APPLICABILITY OF THE BELAIR OPINION

In *Belair,* our Supreme Court reexamined the issue of a governmental entity's liability under a theory of inverse condemnation in the context of

flood control activities which result in unintended physical damage to property. In general, *Belair* concludes that such liability exists only when there is a conjunction of *substantial causation* and *unreasonableness*: "[W]here the public agency's design, construction or maintenance of a flood control project is shown to have posed an unreasonable risk of harm to the plaintiffs, and such unreasonable design, construction or maintenance constituted a substantial cause of the damages, plaintiffs may recover . . . ." (*Belair, supra*, 47 Cal.3d at p. 565.) In arriving at its conclusion, the Supreme Court carefully analyzed and explained each of these two constituent elements giving rise to liability.

*Belair* holds that establishing the existence of substantial causation requires a showing that the flood control facility in question failed to function within its design capacity or otherwise as intended and that such failure bore " ' "a substantial cause-and-effect relationship excluding the probability that other forces *alone* produced the injury" [citations]' " to the damages suffered by the property owners. (*Belair, supra*, 47 Cal.3d at pp. 559-562, quoting from *Souza* v. *Silver Development Co.* (1985) 164 Cal.App.3d 165, 171 [210 Cal.Rptr. 146].)[4]

Under the *Belair* analysis, establishing the existence of unreasonableness is yet another factual undertaking: "The reasonableness of the public agency's conduct must be determined on the facts of each individual case, taking into consideration the public benefit and the private damages in each instance. (See *Keys* v. *Romley* (1966) 64 Cal.2d 396, 409-410 [50 Cal.Rptr. 273, 412 P.2d 529].)" (*Belair, supra*, 47 Cal.3d at p. 566.)[5] Quoting favorably from a seminal law review treatise on the subject of inverse condemnation, *Belair* cautioned that "[r]easonableness, in this context, is not entirely a matter of negligence, but represents a balancing of public need against the gravity of private harm." (*Belair,* 47 Cal.3d at pp. 565-566, quoting from Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, at p. 455.)

On its face, the *Belair* opinion applies to the situation at hand—a situation in which property owners have alleged inverse condemnation liability

---

[4]*Belair* notes that a finding of substantial causation does not require a showing that the failure of the flood control facility was the *sole* cause of the damages. Rather, all that is required is a showing that the facility's failure was a *"substantial concurring cause* of the injury, i.e., where the injury occurred in substantial part because the improvement failed to function as it was intended." (*Belair, supra*, at pp. 559-560.)

[5]*Belair*'s citation of this particular portion of the *Keys* opinion is instructive inasmuch as it is precisely at this point in the *Keys* opinion that the Supreme Court stated that "[t]he issue of reasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, . . ." (*Keys, supra*, at p. 410.) The inescapable conclusion is that *Belair* views the issue of unreasonableness in the flood control/inverse condemnation context as being a question of fact rather than a question of law.

based on a substantial cause-and-effect relationship between the failure of a governmental agency's flood control facility and unintended flood damage to their property. As noted above, in order to establish such liability, *Belair* now requires that a property owner allege and prove not only substantial causation but also the unreasonableness of the public agency's flood control activities. The Bunches have addressed the fact that they never specifically alleged or proved the unreasonableness of the District's flood control activities by arguing forcefully that *Belair* does *not* apply to this case and that, consequently, they were not required to make a showing of unreasonableness.[6] The Bunches' argument is essentially threefold: (1) The District is estopped to argue an unreasonableness requirement; (2) *Belair* only applies to cases which involve the common law "common enemy doctrine"—which doctrine is not involved in this case; and (3) *Belair* does not apply to "intentional diversion" cases—of which this case is one. A close reading of the record before us, and of the *Belair* opinion itself, has convinced us that none of these arguments has merit.

A:  *Estoppel to Argue the Unreasonableness Requirement*

■   The Bunches have drawn our attention to statements made by the District in its trial brief to the effect that a rule of strict liability (liability without regard to reasonableness) obtains in inverse condemnation cases involving property damage which would not have occurred but for an intentional governmental diversion of waters from their natural channel or course. The Bunches go on to argue that this is such a case and that the District (having "induced" the trial court to use a standard of strict liability) is thus estopped to now contend for any standard of liability based in part on a finding of unreasonableness. The Bunches are in error. Inasmuch as the *Belair* opinion was not even in existence at the time this matter was before the trial court, it hardly makes sense to suggest that the District's trial brief induced the trial court to disregard the applicability of *Belair* to the facts of this case. The District has argued the applicability of *Belair*'s standard of unreasonableness to the facts of this case at its earliest opportunity—on appeal.

B:  *Limitation of Belair Analysis to "Common Enemy Doctrine" Cases*

Next, the Bunches argue that *Belair* only applies to those inverse condemnation cases in which the common-law "common enemy doctrine" (the doctrine) comes into play, and that this is not one of those cases. While we

---

[6] Implicitly, of course, quite aside from whether the Bunches properly pled and proved unreasonableness, this argument also addresses the fact that the trial court, in any event, reached no conclusion as to the unreasonableness of the District's flood control activities.

agree that the specific holding of *Belair* is focused on cases in which the doctrine applies, we do not construe the reasoning or the policy considerations underlying *Belair* as being so limited. Our conclusion in this regard renders it unnecessary to determine whether this particular case is one in which the doctrine applies.

■ The doctrine is a common law principle of tort law that "emanat[es] from the complex and unique province of water law." (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 306 [90 Cal.Rptr. 345, 475 P.2d 441].) As described in *Belair*, ". . . the notion is that the owner of land subject to flooding has the right to erect defensive barriers and that any injury caused thereby to lower land owners as the result of the increased discharge or velocity of water is considered *damnum absque injuria*. [Citations.]" (*Belair, supra,* 47 Cal.3d at p. 564.) *Belair* also noted, however, that the doctrine has never permitted the diversion or obstruction of a channelized flow of water from its natural course. (*Ibid.,* fn. 4.)

The doctrine was prominently applied to the issue of a governmental agency's liability for flood damage in the case of *Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19 [119 P.2d 1]. In *Archer,* the Supreme Court held that the property owner plaintiffs could not prevail against the governmental defendants because the damages suffered by them (the property owners) were of a sort that a private person had a right to inflict under the doctrine and "[i]f the property owner would have no cause of action were a private person to inflict the damage, he can have no claim for compensation from the state. [Citations.]" (*Archer,* at p. 24.). This exception from governmental liability was given explicit (albeit somewhat limited) application to the general rule of governmental inverse condemnation liability, absent fault, by the landmark case of *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129]. Thus, it has become commonplace to refer to the "*Archer* exception" to inverse condemnation liability for flood control activities in situations in which there has been no intentional diversion of channelized waters from their natural course and in which the flood control facilities are designed only to protect against the "common enemy" of floodwaters by improving preexisting, natural drainage courses or by collecting surface floodwaters and directing them into their natural means of drainage.

The Bunches observe, correctly, that *Belair* concerns a situation in which the doctrine traditionally would have applied. (In *Belair,* the Supreme Court concluded that the flood control facilities had not diverted waters from their natural channels and that those facilities had been designed to protect against the "common enemy" of historic, periodic flooding.) The Bunches also correctly observe that *Belair* specifically rejects the doctrine as

an *absolute* defense in those cases in which it might apply: "[If there is both substantial causation and unreasonable conduct] plaintiffs may recover *regardless of the fact that the project's purpose is to contain the 'common enemy' of floodwaters.* [Citations.]" (*Belair, supra,* 47 Cal.3d at p. 565, italics added.) Finally, the Bunches observe that the specific holding of *Belair* is limited to "common enemy" situations: "It is sufficient for our purposes here to hold that when a public flood control improvement fails to function as intended, and properties historically subject to flooding are damaged as a proximate result thereof, plaintiffs' recovery in inverse condemnation requires proof that the failure was attributable to some unreasonable conduct on the part of the defendant public entities." (*Id.* at p. 567.) ▮ From these observations, however, the Bunches go on to argue incorrectly that the applicability of the *Belair* analysis and rationale, i.e., the applicability of the *reasoning* underlying the *Belair* opinion, is *limited* to those cases in which the doctrine applies. We disagree.

▮ It is, of course, axiomatic that it is only the ratio decidendi of a Supreme Court opinion that is fully binding as precedent on the lower courts of this state. (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689]; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 783, p. 753: "The *ratio decidendi* is the principle or rule which constitutes the ground of the decision, and it is this principle or rule which has the effect of a precedent. It is therefore necessary to read the language of an opinion in the light of its facts and the issues raised, to determine (a) which statements of law were necessary to the decision, and therefore binding precedents, and (b) which were arguments and general observations, unnecessary to the decision, i.e, dicta, with no force as precedents.") It is equally axiomatic, however, that Supreme Court dicta is not to be blithely ignored. Indeed, such dicta is said to be "persuasive" (*United Steelworkers of America* v. *Board of Education* (1984) 162 Cal.App.3d 823, 835 [209 Cal.Rptr. 16]) and to "command[ ] serious respect." (*Santa Monica Hospital Medical Center* v. *Superior Court* (1988) 203 Cal.App.3d 1026, 1033 [250 Cal.Rptr. 384]; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 785, p. 756: "A statement which does not possess the force of a square holding may nevertheless be considered highly persuasive, particularly when made by an able court after careful consideration, or in the course of an elaborate review of the authorities, . . .")

▮ We are persuaded that the far-reaching and elaborate analysis undertaken in *Belair* should be given application beyond the limited facts of that case, and that the principled dicta of that opinion should guide our consideration of the issues presented in the case before us. While we are generally persuaded to such effect by the entire tenor of the *Belair* opinion, we are persuaded in particular by the following two passages that *Belair*'s

unreasonableness standard should be applied beyond the limited scope of "common enemy" cases: (1) "Thus, while we recognized in *Albers* that strict inverse condemnation liability may not be appropriate in the case of flood control improvements, we emphasized in *Holtz* that such improvements should not be cloaked with the same immunity as private flood control measures. The question, therefore, is *what* standard applies in such cases. *We draw the answer from prior case law, public policy and common sense.*" (*Belair, supra*, 47 Cal.3d at pp. 564-565, italics of last sentence added); and (2) "As earlier discussed, the purposes of the Constitution, *rather than the rules 'emanating from the complex and unique province of water law,'* must fix the extent of a public entity's responsibility. [Citation.]" (*Id.* at p. 567, italics added.)

Had it been the Supreme Court's intention in *Belair* to merely elucidate the extant standard of liability in "common enemy"/inverse condemnation cases, there would have been no need to reach beyond the *Archer-Albers-Holtz* line of authority (i.e., to reach beyond "prior case law") in so doing. However, in focusing its attention on constitutional principles as opposed to those common law principles embodied in the doctrine, and in broadening the scope of its analysis to include "public policy and common sense" in addition to "prior case law," the Supreme Court appears to us to have signaled an intention to seek a uniform standard of liability that would apply across the entire spectrum of flood control/inverse condemnation cases involving unintended physical damage to property. Such a standard would permit an equitable, and constitutional, balancing of the competing legal and public policy considerations present in such cases without requiring hypertechnical, and hopelessly contrived, distinctions as to the nature and source of the floodwaters or as to whether the floodwaters were intentionally "diverted" to or from a particular place.

The better rule of law is the one that results in the application of *Belair*'s reasoning and analysis to all flood control/inverse condemnation cases involving unintended physical damage to property—whether or not those cases call the "common enemy doctrine" into play.

C: *Applicability of Belair to "Intentional Diversion" Cases*

Finally, the Bunches argue that *Belair* does not apply to cases, such as this one, which involve a public agency's intentional diversion of waters from their natural course or channel. We conclude to the contrary.

*Belair* does acknowledge a line of District Court of Appeal cases which have imposed a rule of strict, absolute liability in "intentional diversion"

situations,[7] but declines to review or examine those cases in detail (pointing out that the facts in *Belair* did not require such a review or examination). (*Belair, supra*, 47 Cal.3d at pp. 566-567.) However, *Belair* goes on to cast that entire line of cases into doubt by observing: "It is doubtful, however, whether evidence of an unintended 'diversion'—an elusive concept to begin with [citation]—would elevate the test of inverse condemnation liability to absolute liability, rather than a reasonableness standard." (*Id.* at p. 567.)

This immediately preceding quote from *Belair* serves to highlight one of the semantic confusions which seems to have attended this general area of the law from the outset: When one speaks of the "diversion" of water, is one speaking of a diversion of water *from* a particular place or *to* a particular place? The answer would appear to have a great deal to do with whether or not a diversion is deemed to be "intentional." A flood control facility which collects stream waters from two natural watercourses and moves them to yet a third clearly produces an intentional diversion of waters *from* the first two natural watercourses. However, were this same flood control facility to "spring a leak" and disgorge its contents in an area where no such disgorgement was planned or anticipated, the facility would equally clearly produce an *un*intentional diversion of water *to* a particular location.

At least two different statements in *Belair* suggest that the Supreme Court's focus in that opinion is on *un*intentional diversions of water *to* a particular place: (1) At the very outset of the opinion, in setting forth the general nature of the holding reached in *Belair,* the Supreme Court states: "We conclude that *in the case of an unintended breach of a flood control improvement,* plaintiffs are not entitled to recover absent proof of such unreasonable conduct." (*Belair, supra*, 47 Cal.3d at p. 554, italics added); and (2) In the very quote which served to initiate this discussion, the Supreme Court speaks of "evidence of an unintended 'diversion'" in briefly discussing the four District Court of Appeal cases which concerned *intentional* diversions of water *from* a particular place.[8] Such an analytical framework is logically consistent both with an inquiry into the reasonableness of a public agency's conduct and with an inquiry into whether a flood control facility failed to function as intended.

---

[7] *Yee* v. *City of Sausalito* (1983) 141 Cal.App.3d 917 [190 Cal.Rptr. 595]; *Marin* v. *City of San Rafael* (1980) 111 Cal.App.3d 591 [168 Cal.Rptr. 750]; *Imperial Cattle Co.* v. *Imperial Irrigation Dist.* (1985) 167 Cal.App.3d 263 [213 Cal.Rptr. 622]; and *McMahan's of Santa Monica* v. *City of Santa Monica* (1983) 146 Cal.App.3d 683 [194 Cal.Rptr. 582].

[8] We do not wish to be understood, of course, as suggesting that *intentional* diversions of water *to* a particular place cannot give rise to inverse condemnation liability or that establishing that liability in such a case would require an inquiry into the reasonableness of the public agency's conduct. Such a diversion would result in intentional physical damage to property and would almost always give rise to governmental liability as a matter of course. However, we are concerned in this instance, as the Supreme Court was in *Belair,* with unintentional physical damage.

■ We conclude that the appropriate focus in flood control/inverse condemnation cases involving unintended physical damage to property is on whether water is *un*intentionally diverted *to* a particular place—without regard to whether the water is intentionally diverted *from* a particular place.

In summary, we hold that the standard of reasonableness which is enunciated in *Belair* is uniformly applicable in *all* flood control/inverse condemnation cases in which unintended physical damage to property is alleged to have been substantially caused by an unintended breach in flood control facilities—that is, by a failure of those facilities to function within their design capacity or otherwise as intended.

## II

### REMANDING TO THE TRIAL COURT FOR A RETROACTIVE APPLICATION OF BELAIR

While *Belair* does not directly overrule prior case law, it does reexamine and reevaluate the legal precedents which had become recognized landmarks in this area of flood control/inverse condemnation law. ■ ■■■
■ Further, as noted above, *Belair* has cast the reasoning of at least one line of District Court of Appeal "intentional diversion" cases into doubt.[9] Finally, *Belair* has for the first time suggested a *uniform* standard of analysis for this entire area of the law. The question arises, then, whether the *Belair* analysis and rationale represent such a dramatic departure from prior authority as to constitute a de facto "overruling" of that authority, and, if so, whether the "new rule" should be applied retroactively to the case at hand.

■ Our interpretation of *Belair* clearly yields at least one rule of law that directly contravenes prior District Court of Appeal case authority: An "unreasonableness" standard of liability, as opposed to a "strict" standard of liability, applies to all flood control/inverse condemnation cases involving unintended physical damage to property substantially caused by an unintended breach in flood control facilities—*without regard* to whether the

---

[9] Contrary to the Bunches' assertion, *Belair* did not leave the District Court of Appeal "intentional diversion" cases (see fn. 7, *ante*) "untouched." The fact that *Belair* did not expressly overrule these decisions is of no particular significance. As our Supreme Court has had occasion to observe of itself: "[W]e do not recognize any obligation on the part of this court to interpret and distinguish decisions of the district court of appeal because it is contended that the rule there laid down is inconsistent with the one adopted by this court, either in its previous opinions or in the opinion pronounced, . . ." (*Burgesser* v. *Bullock's* (1923) 190 Cal. 673, 682 [214 P. 649].)

floodwaters were intentionally diverted from a natural channel or course. In this sense, if in no other, our interpretation of *Belair* casts it in the light of having announced a new rule of law that, for all practical purposes, overrules prior authority.

Given that this is our view of *Belair,* we turn our attention next to the question of the retroactive application of the new rule. Ordinarily, an overruling opinion *is* given retroactive application. (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 151-152 [181 Cal.Rptr. 784, 642 P.2d 1305].) Exceptions to such retroactive application, however, have been recognized when considerations of public policy and/or fairness require something less than full retroactivity (e.g., when full retroactivity would serve to invalidate preexisting contracts or to impair vested property rights). (*Ibid.*) We are aware of no such impediments to a retroactive application of *Belair* in this case. Indeed, the very fact that *Belair* represents nothing more, or less, than a consolidation and harmonization of "prior case law, public policy and common sense" (*Belair, supra,* 47 Cal.3d at p. 565) is itself a persuasive indication that *Belair* is consistent with, rather than contrary to, considerations of public policy and/or fairness. Thus, we conclude that the general rule of retroactive application should obtain in this instance and that *Belair* should be applied retroactively to the facts of this case.

## CONCLUSION

This matter shall be remanded to the trial court for further proceedings limited to the issue of unreasonableness.[10] Our remand is made in the same spirit as was that which was ordered in the case of *Keys* v. *Romley, supra,* 64 Cal.2d 396: "[C]onsideration must be given to standards of reasonableness, and the appealing defendants should not be denied an opportunity to defend their acts on that basis." (*Keys,* at p. 411.)[11]

---

[10] The Bunches have argued that there is no need for a remand of this case to the trial court to deal with the issue of unreasonableness. Briefly, their argument is twofold: (1) The state of the record is such that a trier of fact must conclude that the District's flood control activities in this case were unreasonable; and (2) this court, in the interest of judicial economy and efficiency, should exercise its independent power to make factual determinations (Code Civ. Proc., § 909) and resolve the issue of unreasonableness. Neither argument is persuasive.

First, whatever the state of the record may be, it does not contain an explicit, factual balancing of public need and private harm of the sort contemplated by *Belair.* This is a task best suited to the skills and resources of the trial court, and we leave it to that forum for resolution. Second, the power of this court to make independent factual determinations does not extend to cases, such as this one, in which the trial court has made *no* relevant findings. (*Estate of Pendell* (1932) 216 Cal. 384, 387 [14 P.2d 506]; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 657, p. 637.)

[11] While our remand may be made in the same spirit as that which was ordered in *Keys,* it is not made to precisely the same effect. The issue of (un)reasonableness in a "*Belair* case" is not an affirmative defense to be raised and proved by the defending public agency. Rather,

Inasmuch as the liability of the District remains in question pending a determination as to the reasonableness *vel non* of the District's acts, we deem a consideration at this time of the other issues raised on appeal to be premature.

## DISPOSITION

The judgment is reversed, and this matter is remanded to the trial court for further limited proceedings consistent with this opinion.

McDaniel, J., and Hollenhorst, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied December 13, 1989. Mosk, J., was of the opinion that the petition should be granted.

---

inasmuch as unreasonableness on the part of the public agency is a constituent element of liability in such a case, the plaintiff bears the burden of proof with respect to establishing that unreasonableness.